# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 52893-2-II |
| Respondent, | |
| v. | |
| JAMES HENDERSON LISTOE, | PUBLISHED OPINION |
| Appellant. | |

CRUSER, J. — James Listoe appeals his convictions of possession of methamphetamine with intent to deliver and possession of a controlled substance (Suboxone). He argues that he is entitled to a new trial because the trial court employed an improper standard under GR 37 when it allowed the State to exercise a peremptory challenge excusing the only juror who was a member of a racially cognizable group. Listoe also argues that there was insufficient evidence that he possessed methamphetamine and Suboxone.

We hold that, under the totality of the circumstances, an objective observer aware of implicit bias could view race as a factor in the State's use of the peremptory challenge. We also hold that there was sufficient evidence that Listoe had constructive possession over the methamphetamine and the Suboxone discovered in the car that he was driving.

Accordingly, we reverse and remand for a new trial.

1

## FACTS

### I. LISTOE'S ARREST

On May 11, 2018, Deputy Andrew Hren of the Kitsap County Sheriff's Office observed a black car parked at a 7-Eleven convenience store. On running the license plate, Hren discovered that the car's registration had expired. The car pulled out of the 7-Eleven parking lot, Hren got behind it and pulled it over. Listoe, who was driving the car, did not pull over immediately but traveled for about 1,000 feet first, which Hren believed was uncommon.

As Hren approached the car, he could see Listoe making "a bunch of movements with his hands." 2 Verbatim Report of Proceedings (VRP) at 193. Listoe opened the door and began to step out, but Hren ordered him to get back in the car. Hren observed Listoe making additional "furtive movements" in his lap area. *Id*. Hren then ordered Listoe to place his hands on the steering wheel, and Listoe complied. Hren informed Listoe of the reason for pulling him over, and Listoe responded that the car was not his and that he did not know the registration was expired.

Rhonda Lemon was sitting in the car's passenger seat. After briefly speaking to Lemon, Hren told Lemon that she was free to leave, and she left. Lemon was not searched during the encounter.

Hren ordered Listoe out of the vehicle and placed Listoe under arrest.[1] During the search incident to Listoe's arrest, Hren found a plastic bag that contained a white crystalline substance on Listoe's person. The substance appeared to be methamphetamine. Listoe also had $221 in his wallet.

---

[1] Listoe was arrested on an unrelated warrant. Listoe's counsel made a motion in limine asking the trial court to prohibit any mention of the basis for the arrest. The trial court granted the motion.

A K-9 unit alerted to the presence of controlled substances in the car Listoe was driving. Due to the K-9 alert, Hren obtained a search warrant to search the interior of the vehicle for additional evidence of controlled substances. Hren and Deputy Stanley Langlow searched the vehicle. Behind the driver's seat, Hren discovered a black reusable grocery bag that contained a white grocery bag and fruits and vegetables. The white bag, in turn, contained a black zippered pouch, liquor bottles, and a package of sublingual Suboxone strips.[2] The zippered pouch contained a notepad with a name and phone number, a digital scale, a plastic Tupperware container that had white residue, a factory packaged plastic bag with syringes, and a mint container that contained shards of a white crystalline substance that Hren believed was methamphetamine. The substance weighed approximately six and a half grams.

Hren and Langlow also searched the car for any indication of Listoe's "possession and control" over the vehicle. *Id.* at 218. They did not find any evidence specifically tying Listoe to the vehicle. The deputies did not obtain fingerprints off the zippered pouch or any other items in the grocery bags because the nature of the plastics and metals and the condition of the zippered pouch made it unlikely that a good sample could be collected.

The white crystalline substance found on Listoe's person during the search incident to arrest was tested at the crime lab and confirmed to be methamphetamine. The amount, weighing 3.3 grams, was consistent with a personal use quantity. The substance inside the mint container was also confirmed to be methamphetamine. The quantity of methamphetamine in the mint

---

[2] Suboxone is a pain reliever that is also used in treatment of opiate addiction.

container exceeded the amount typically associated with personal use and was indicative of dealing.

Listoe was charged with one count of possession of methamphetamine with intent to manufacture or deliver and one count of possession of a controlled substance (Suboxone).

## II. JURY SELECTION AND TRIAL

The case proceeded to trial. While defense counsel was questioning prospective jurors during voir dire, he asked the venire whether anyone agrees with the saying "it's better to let a guilty person go free than to lock up an innocent person or maybe to let ten guilty people go free than to lock up an innocent person." 1 VRP at 112. One juror expressed agreement with that sentiment. Defense counsel expanded further,

> Sometimes I get people who disagree with that. Again, there's no wrong answers. If you think, I would rather punish an innocent person than let a guilty person go free, you're not going to get into any kind of trouble. I just want to know it.

*Id.* at 113. Juror 17 made some kind of expression that caused defense counsel to ask, "No. 17, you're just laughing at me?" *Id.* Juror 17 explained,

> Just the situation and how things are. Personal experience being innocent -- people being innocent and still getting in trouble. Just smirking at that. I've seen it happen. I know it happens.

*Id.* Juror 17 then explained that his job, if selected for the jury, is to "take everything in and to look at everything thoroughly to make sure that we don't have anybody that's innocent get in trouble for something they didn't do." *Id.*

During the State's voir dire, the State presented a hypothetical scenario to the prospective jurors. The prosecutor asked the venire to imagine that a law exists prohibiting making, selling, or eating cookies and that the prosecutor was charged with eating a cookie. The prosecutor asked the

jury to assume there was video surveillance footage, "a million witnesses," and plenty of photographs all confirming that the prosecutor ate a cookie. *Id.* at 131-32. The prosecutor directed the questions toward Juror 17, the only Black individual in the venire, first. The following exchange took place,

> [THE STATE]: Juror 17, what would you do?
> [JUROR 17]: I would question the law, period, to be honest with you.
> [THE STATE]: Like I said, why this is a law, I have no idea. But the law is the law. That's the law. The evidence is what I said. You know, it's on ten different surveillance cameras, a bunch of photographs, a million witnesses. What do you do as a juror?
> [JUROR 17]: Take it all into account. I mean, you have to because of the law, but I would still question law. Like you're just eating a cookie. Why is it even a law?
> [THE STATE]: Good question for your politicians; right? So you said -- what would you say you would do?
> [JUROR 17]: I would have to take all the evidence in, because there's obviously a law. I would still question that law, just period.
> [THE STATE]: Would you have any problems convicting me for eating the cookie?
> [JUROR 17]: Yes.
> [THE STATE]: Because of the law?
> [JUROR 17]: Yes.
> [THE STATE]: Okay. So the law is -- I will say -- I mean, it's kind of a like hyperbolic. It's a ridiculous sounding law, to make a point. So the law -- if you disagree with the law, would you have problems following it?
> [JUROR 17]: Yeah.

*Id.* at 132-33. Juror 17 described a law that he recalled from Arkansas, where it was previously illegal to mispronounce the name of the state. The State asked Juror 17 if he would have reservations about convicting an individual that had been recorded mispronouncing the word "Arkansas," assuming that law was still in effect. *Id.* at 136. Juror 17 responded "[i]t's just for the principles," and he agreed the law was "just silly." *Id.*

The State repeated the cookie law hypothetical and asked 10 other potential jurors whether they would have any hesitation convicting under the fictional law, and each juror responded immediately that he or she would have no hesitation convicting. Of those 10 other jurors, only

Juror 7 expressed that "[t]here might be some reservations, but the rules -- everyone knows the rules ahead of time." *Id.* at 134. Juror 7 was eventually stricken from the venire.[3] The State asked once more, to the entire venire, whether anyone would "have a problem convicting me for making and selling my own cookies?" and there was no response. *Id.* at 139.

Following voir dire, the State used a peremptory challenge to dismiss Juror 17. Listoe objected to the State's peremptory challenge using the court's GR 37 form. The State explained that it based the peremptory challenge on Juror 17's responses to the cookie hypothetical, as well as his statement regarding the law against mispronouncing the word "Arkansas." *Id.* at 161-62. The State believed that Juror 17 indicated an inability to follow the law. Listoe contended that this explanation would not survive under the new, objective standard applied to peremptory challenges because the hypothetical did not demonstrate an unwillingness to follow real world laws.

The trial court cited GR 37(e) and, in accordance with the rule, stated that it would base its decision on the "totality of the circumstances," and that the peremptory challenge would be denied "[i]f the court determines that an objective observer could view race or ethnicity as a factor in the use of this peremptory challenge." *Id.* at 162-63.

In applying the standard, the trial court explained,

> when Juror 17 made the comments that [the State] indicated concerning the cookies, that it was clear that there was some concern over the fact that it was -- it's been termed a lot of different ways, a silly example, the cookie example. He very clearly said that he would not be able to follow the law if that was the law because of his feelings that it was silly.
>
> He also made the comment concerning the way to pronounce Arkansas or "Arkansas," again, with the idea of the issue of following the law, and I think that that is not something that would disqualify this peremptory challenge.

---

[3] It is not clear from this record whether Listoe or the State used a preemptory challenge to strike Juror 7.

The peremptory challenge can be denied if an objective observer could view race or ethnicity as a factor, but simply the factors that I see clearly raised is one of the factors is -- No. 17 is a [B]lack man, so race is one of the issues that needs to be addressed by the Court.

But his comments concerning his inability to follow the law in the example of the hypothetical that was given by [the State] does not -- could lead an objective observer to view that that would be the reason why the use of the peremptory was, rather than race or ethnicity, so I'm going to allow for the peremptory challenge.

*Id.* at 163-64. After the trial court allowed the peremptory challenge, the trial court affirmed on the record that Juror 17 was the only Black juror on the venire.

During trial, the witnesses testified consistently with the facts as summarized above. Listoe made a motion to dismiss the charges at the close of the State's case, arguing that the State failed to present sufficient evidence of either actual or constructive possession of the items discovered in the car related to intent to deliver. The trial court denied this motion.

At the close of the case, Listoe requested an unwitting possession instruction. The trial court agreed, and the unwitting possession instruction was submitted to the jury.

The jury found Listoe guilty of possession of methamphetamine with intent to deliver and possession of a controlled substance (Suboxone). Listoe was given a prison-based Drug Offender Sentencing Alternative[4] sentence of 90 months, with 45 months to be served in confinement and the remainder to be served in community custody.

Listoe appeals his convictions.

---

[4] Former RCW 9.94A.660 (2016).

DISCUSSION

I. PEREMPTORY CHALLENGE

Listoe argues that the trial court improperly applied GR 37 when considering his objection to the State's peremptory challenge of Juror 17. Listoe asserts that the trial court "turned the GR 37 analysis on its head," when the trial court determined that a persuasive race-neutral reason existed justifying the State's use of the peremptory challenge. Br. of Appellant at 13. Listoe claims that the proper consideration is whether an objective observer could find that race was a factor, and, if so, the peremptory challenge must be denied. Listoe argues that because the peremptory challenge was used to strike the only member of a racially cognizable group, an objective observer could view race or ethnicity as a factor and the peremptory challenge should not have been allowed.

The State contends that the trial court engaged in the proper analysis because the trial court considered whether an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge, and its ruling was not predicated on the persuasiveness of the State's race-neutral justification. The State asserts that (1) the circumstances the court should consider pursuant to GR 37(g) all tend to demonstrate that Juror 17 was not treated disparately as compared to other jurors, (2) none of the historically discriminatory reasons under GR 37(h) apply to this case, and (3) there is no evidence in the record that the peremptory challenge was based on an assertion of the negative behavioral factors in GR 37(i).

We hold that the State was improperly permitted to peremptorily strike Juror 17. Because we sit in the same position as the trial court and review the record de novo, we may look beyond the State's proffered justification for the peremptory challenge. An objective observer aware of

implicit bias could view race as a factor in the State's exercise of the peremptory challenge because Juror 17 only expressed discomfort rather than an unwillingness to convict based on a hypothetical law. In addition, Juror 17 stated that he has personally known innocent individuals who have been found guilty, but that is "how things are." 1 VRP at 113. Finally, Juror 17 was the sole member of a racially cognizable group, an objective observer aware of implicit bias could view race as a factor in the State's exercise of the peremptory challenge.

### A. LEGAL PRINCIPLES

GR 37 provides that, either a party or the court "may object to the use of a peremptory challenge to raise the issue of improper bias." GR 37(c). After an objection has been raised, the party exercising a peremptory challenge is required to articulate its reasons for doing so. GR 37(d). The trial court then evaluates the reasons for exercising the challenge under the totality of the circumstances. GR 37(e). If "an objective observer *could* view race or ethnicity as a *factor* in the use of the peremptory challenge, then the peremptory challenge shall be denied." GR 37(e) (emphasis added). GR 37(f) defines "objective observer" as one who "is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in Washington."

This standard represents a deliberate departure from the federal *Batson*[5] test that was previously used to evaluate whether a peremptory challenge was racially motivated. *State v. Jefferson*, 192 Wn.2d 225, 243, 429 P.3d 467 (2018) (plurality opinion). Under *Batson*, the party contesting the peremptory challenge is required to first make a prima facie showing giving rise to an inference that the challenge was exercised for a discriminatory purpose. *Jefferson*, 192 Wn.2d

---

[5] *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

at 232; *Batson*, 476 U.S. at 94. Next, the burden shifts to the party exercising the challenge to provide a race-neutral justification. *Jefferson*, 192 Wn.2d at 232; *Batson*, 476 U.S. at 97. Finally, if the party exercising the challenge is able to provide such a justification, the court would next consider whether the party contesting the peremptory challenge has demonstrated purposeful discrimination. *Jefferson*, 192 Wn.2d at 232; *Batson*, 476 U.S. at 98.

Despite Washington's previous adherence to the *Batson* test, Washington courts recently departed from the *Batson* formulation in favor of a new test. The *Batson* formulation is considered deficient by Washington courts because it requires a party contesting a peremptory challenge to demonstrate purposeful discrimination, which is difficult to prove "'even where it almost certainly exists.'" *Jefferson*, 192 Wn.2d at 242 (internal quotation mark omitted) (quoting *City of Seattle v. Erickson*, 188 Wn.2d 721, 735, 398 P.3d 1124 (2017)). In addition, this formulation failed to take into account the realities of implicit or unconscious racial bias. *Id*.

The Washington Supreme Court has addressed the challenge of proving purposeful discrimination by creating a bright-line rule that the first step of making a prima facie showing is established whenever a peremptory challenge is exercised to dismiss the only individual from a "racially cognizable group." *Erickson*, 188 Wn.2d at 734. This reformulation of the first step, however, did not resolve "ongoing concerns of unconscious bias," nor did it address the best approach to the third step of the *Batson* test. *Jefferson*, 192 Wn.2d at 241.

GR 37 was created with the specific objective of addressing *Batson's* deficiencies. *Id.* at 243. Echoing the language used in GR 37(e), the court reframed the third step in the *Batson* test to consider whether "'an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge,'" as opposed to whether the proponent of the peremptory strike is acting

with purposeful discrimination. *Id.* at 249. Under GR 37, there is no longer any requirement of making a prima facie showing of racial discrimination and "simple citation" to the rule is sufficient to compel an analysis pursuant to its provisions. GR 37(c).

GR 37 does not provide guidance to us regarding which standard of review we should apply when considering the propriety of a trial court's decision following a peremptory challenge. However, in *Jefferson*, the court stated that when considering whether an objective observer could view race or ethnicity as a factor, a reviewing court "stand[s] in the same position as does the trial court." 192 Wn.2d at 250. The court rejected the prior "'clearly erroneous'" standard as too deferential. *Id.* Accordingly, the question of whether an objective observer could view race or ethnicity as a factor in a peremptory challenge is subject to de novo review. *Id.*

Under GR 37(g), when evaluating the justification for a peremptory challenge, a court may take the following nonexclusive factors under consideration:

> (i) the number and types of questions posed to the prospective juror, which may include consideration of whether the party exercising the peremptory challenge failed to question the prospective juror about the alleged concern or the types of questions asked about it;

> (ii) whether the party exercising the peremptory challenge asked significantly more questions or different questions of the potential juror against whom the peremptory challenge was used in contrast to other jurors;

> (iii) whether other prospective jurors provided similar answers but were not the subject of a peremptory challenge by that party;

> (iv) whether a reason might be disproportionately associated with a race or ethnicity; and

> (v) whether the party has used peremptory challenges disproportionately against a given race or ethnicity, in the present case or in past cases.

In addition, a court may look to GR 37(h), which provides a list of presumptively invalid reasons that cannot justify a peremptory challenge because these reasons have been historically "associated with improper discrimination in jury selection in Washington State." Similarly, certain types of conduct have also been associated with historically discriminatory peremptory challenges and cannot be relied upon as a justification absent proper notice and corroboration from the judge or opposing counsel. GR 37(i).

B. ANALYSIS

In viewing the totality of the circumstances, an objective observer aware of the realities of implicit bias could view race as a factor in the State's peremptory challenge. First, the Supreme Court has previously recognized evidence of a discriminatory purpose when "the sole member of a racially cognizable group has been struck from the jury." *Erickson*, 188 Wn.2d at 734.

In addition, Juror 17 expressed some skepticism of the criminal justice system based on his personal experience and the experiences of people he knows. Juror 17 attributed this perception to "the situation and how things are." 1 VRP at 113. Although the State did not rely on these comments when exercising the peremptory challenge, Juror 17's comments echo justifications for exclusion from a jury that have historically been associated with discrimination. For example, parties are no longer permitted to rely on expressions of distrust of law enforcement or statements regarding "having a close relationship with people who have been stopped, arrested, or convicted of a crime," as reasons to exclude someone from a jury. GR 37(h)(ii), (iii).

The State contends that race was not a factor in Juror 17's exclusion from the jury because other jurors were asked the same questions, but most of the other jurors did not express any reservation convicting the individual who ate the cookie. Moreover, the State claims the record

does not contain any evidence demonstrating that the State's proffered reason for striking Juror 17 has been "'disproportionately associated with [a] race or ethnicity.'" Br. of Resp't at 10 (quoting GR 37(g)(iv)). Even if true, implicit racial bias and disparate experiences might still be a factor when the only member of a racially cognizable group on the venire provides a different response to a hypothetical scenario from almost all the other prospective jurors.

Finally, although Juror 17 expressed discomfort at the idea of convicting an individual for violating a "ridiculous sounding law," he never stated that he would refuse to follow the law or that he would vote to acquit in spite of the evidence.[6] 1 VRP at 133. The State posed a question based on a hypothetical law that, although silly and nonsensical, would involve a significant interference with liberty. The State then asked Juror 17 if he would have a "problem[]" convicting someone of violating this law. *Id.* But asking someone if they have a problem convicting someone of violating a plainly ridiculous law is not the same as asking them whether they would *follow* the law as given to them by the court. Any rational person would have a problem with convicting someone for eating a cookie. Instead, when asked what he would do as a juror, Juror 17 explained that he would "[t]ake it all into account. I mean you have to because of the law." *Id.* at 132. And although he would "still question that law, just period," Juror 17 recognized that he would "have to take all the evidence in, because there's obviously a law." *Id.*

Even if the State's race-neutral justification was persuasive, under GR 37, a court's task is to determine whether an objective observer aware of implicit bias could view race or ethnicity as

---

[6] If the State, in exercising the peremptory challenge, perceived Juror 17's responses regarding the hypothetical laws as evincing bias in reference to the action, or as indicating an inability to consider the matter impartially, then the State could have challenged the juror for cause under RCW 4.44.170(2).

a factor. GR 37(e). Given that Juror 17 was the only Black member of the venire, that Juror 17 was the only juror who voiced some skepticism with the criminal justice system due to his personal experience, and that Juror 17 merely expressed discomfort at the idea of convicting someone under a hypothetical scenario involving a ridiculous law, an objective observer aware of implicit, institutional, and unconscious bias could view race as a factor in the State's exercise of this peremptory challenge.[7]

In so holding, we do not mean to suggest that the State, in exercising the challenge, acted with a discriminatory purpose or that the State acted with unconscious or implicit bias. Whereas the prior *Batson* formulation required the party contesting use of a preemptory challenge to prove such a discriminatory purpose, GR 37 represents a sweeping change that focuses instead on the perspective of an objective observer who is presumed to be aware that implicit, institutional, and unconscious bias, as well as purposeful discrimination, have all contributed to the unfair exclusion of jurors.[8] In light of the totality of the circumstances, and in consideration of GR 37's purpose of creating a more scrupulous approach to eliminating the unfair exclusion of jurors on the basis of

---

[7] Here, although the trial court initially articulated the correct standard when summarizing its task pursuant to GR 37(e), its reasoning recalled the standard rejected by the Supreme Court in *Jefferson*. 192 Wn.2d at 249. The trial court allowed the peremptory challenge because it determined that an objective observer could conclude that the State had a race-neutral justification for the challenge. In effect, the trial court's construction required Listoe to demonstrate purposeful discrimination. Such a showing is no longer necessary under GR 37. *Id.* at 242.

[8] The goals of *Batson* and its progeny were not only to protect a defendant's "right to be tried by a jury whose members are selected by nondiscriminatory criteria," but also to protect, under the Equal Protection Clause, an individual juror's "right not to be excluded . . . on account of race." *Powers v. Ohio*, 499 U.S. 400, 404, 409, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991).

implicit or unconscious bias, the State was improperly permitted to exercise the peremptory challenge.

## II. SUFFICIENCY OF THE EVIDENCE[9]

Listoe claims that there was insufficient evidence that he had constructive possession over the methamphetamine and Suboxone discovered on the back floorboards of the car he was driving. Listoe asserts that evidence was insufficient because (1) the car was not his, (2) the officers did not find evidence proving that Listoe had dominion and control over the car and its contents, and (3) the drugs on the rear floor of the car could have reasonably belonged to Lemon. In addition, Listoe explains that because the amount of methamphetamine discovered on his person during the search incident to arrest was consistent with personal use, if the State did not provide sufficient evidence of his constructive possession over the items in the car, the evidence does not support his conviction of possession of methamphetamine with intent to deliver.

The State contends that there was sufficient evidence that Listoe had dominion and control over the items in the backseat. The State argues that dominion and control need not be exclusive to establish constructive possession, and even if the jury believed the items in the backseat belonged to Lemon, taken in the light most favorable to the State, there was sufficient evidence that Listoe constructively possessed the evidence in the vehicle.

We hold that the evidence was sufficient to establish that Listoe had constructive possession over the items the officers discovered in the back of the car. The facts that (1) Listoe was driving the vehicle, (2) Listoe had methamphetamine on his person, which is one of the same

---

[9] We address Listoe's insufficiency of the evidence argument because reversal on this basis would result in dismissal with prejudice and prohibit a retrial. *State v. Hickman*, 135 Wn.2d 97, 99, 954 P.2d 900 (1998).

drugs found in the back of the vehicle, and (3) Deputy Hren observed Listoe making furtive movements while taking an uncommonly long time to pull over, provide sufficient evidence of constructive possession to support Listoe's convictions.

A. LEGAL PRINCIPLES

*1. Standard of Review*

To determine whether the evidence is sufficient to support a conviction, we consider whether any rational trier of fact could have found guilt beyond a reasonable doubt. *State v. Cardenas-Flores*, 189 Wn.2d 243, 265, 401 P.3d 19 (2017). The defendant admits the truth of the State's evidence, and we must view the evidence and all reasonable inferences arising therefrom in the light most favorable to the State. *Id.* at 265-66. Circumstantial evidence and direct evidence are considered equally reliable. *Id.* at 266. We will not review the finder of fact's credibility determinations. *Id.*

*2. Constructive Possession*

Possession can either be actual or constructive. *State v. Reichert*, 158 Wn. App. 374, 390, 242 P.3d 44 (2010). Whereas actual possession requires an individual to have physical custody of a given item, constructive possession may be shown where the individual has "dominion and control" over that item. *Id.* Control need not be exclusive to establish possession, and more than one person can be in possession of the same item. *State v. George*, 146 Wn. App. 906, 920, 193 P.3d 693 (2008).

We examine the totality of the circumstances and look to a variety of factors to determine whether an individual has dominion and control over an item. *State v. Lakotiy*, 151 Wn. App. 699, 714, 214 P.3d 181 (2009). For example, we may consider whether the individual could readily

convert the items to his or her actual possession. *State v. Jones*, 146 Wn.2d 328, 333, 45 P.3d 1062 (2002). We may also consider the defendant's physical proximity to a given item. *State v. Chouinard*, 169 Wn. App. 895, 899, 282 P.3d 117 (2012). However, physical proximity, without more, is insufficient to establish constructive possession. *Jones*, 146 Wn.2d at 33.

Finally, we may also consider whether the defendant had dominion and control over the broader premises in which the item was located. *State v. Shumaker*, 142 Wn. App. 330, 334, 174 P.3d 1214 (2007). "When a person has dominion and control over a premises, there is a rebuttable presumption that the person has dominion and control over items on the premises." *Reichert*, 158 Wn. App. at 390. But mere knowledge that an item exists on the premises is insufficient to establish dominion and control. *Chouinard*, 169 Wn. App. at 899.

In cases where the defendant was driving a vehicle that the defendant owned, courts have found sufficient evidence that the defendant had dominion and control over the vehicle's premises and its contents. *State v. Bowen*, 157 Wn. App. 821, 828, 239 P.3d 1114 (2010); *State v. Turner*, 103 Wn. App. 515, 523-24, 13 P.3d 234 (2000). We have also previously upheld a conviction of unlawful possession of a firearm on a theory of constructive possession where the driver of the vehicle was not the owner of the vehicle. *State v. Echeverria*, 85 Wn. App. 777, 780, 783, 934 P.2d 1214 (1997). Conversely, where the appellant was a passenger, rather than a driver, and the passenger did not own the vehicle, some courts have found that the appellant did not have dominion and control over the premises and its contents. *See, e.g.*, *Chouinard*, 169 Wn. App. at 902-03; *George*, 146 Wn. App. at 923; *State v. Cote*, 123 Wn. App. 546, 550, 96 P.3d 410 (2004).

B. ANALYSIS

Considering the evidence in the light most favorable to the State, a rational trier of fact could have found that Listoe had constructive possession over the items discovered in the back of the car. Even if the items discovered in the car could have belonged to Lemon, the State was not required to prove that Listoe had exclusive control over the items to establish constructive possession. *See George*, 146 Wn. App. at 920.

The fact that Listoe was driving the car weighs in favor of finding that Listoe had dominion and control over the vehicle and its contents. We have found sufficient evidence of dominion and control over a vehicle even where the vehicle did not belong to the driver, but the contraband was in plain sight and within reach. *Echeverria*, 85 Wn. App. at 783.

The fact that fruits and vegetables, which are perishable items, were discovered in the same reusable black grocery bag as the white bag containing the contraband, shows that these items likely belonged to either Listoe or Lemon. It is unlikely that perishable items were left in the car by a prior driver or passenger. Further, Listoe's furtive hand movements on two occasions, as well the fact that Listoe drove an uncommonly long distance before pulling over, raise an inference that he was handling the contraband at that time, or possibly strategizing about where to hide it. This same fact could also support a reasonable inference that Listoe could convert dominion and control over the items in the vehicle into his actual possession. In addition, because Hren found methamphetamine on Listoe's person during the search incident to arrest, and methamphetamine was also discovered in the back of the vehicle, a rational trier of fact could infer that the methamphetamine in the back of the vehicle belonged to Listoe as well.

While the above facts may not have been sufficient to establish constructive possession in isolation, taken together, they would lead a rational trier of fact to find that Listoe had constructive possession over the items in the back of the vehicle he was driving. Consequently, Listoe's convictions for possession of methamphetamine with intent to deliver and his conviction for possession of Suboxone are supported by sufficient evidence.

CONCLUSION

We hold that the State's peremptory challenge should not have been allowed over Listoe's GR 37 objection because an objective observer could have viewed race or ethnicity as a factor in the use of the peremptory challenge to strike the only Black individual from the venire. We also conclude that the State presented sufficient evidence of constructive possession to sustain Listoe's convictions.

Accordingly, we reverse and remand for a new trial.

_____
CRUSER, J.

I concur:

_____
SUTTON, A.C.J.

MELNICK, J. (concurring)—I respectfully concur with the majority opinion's result, but I write separately to explain my reasoning as it relates to the application of GR 37.

GR 37 is a burden shifting rule. Either a party or the court can first raise the issue of improper bias when an attempt is made to exclude a potential juror based on race or ethnicity. GR 37(a), (c). Once an objection is raised, the party exercising the peremptory challenge must articulate the reasons for its challenge. GR 37(d). The court is then charged with determining whether the reasons, based on the totality of the circumstances, justify the peremptory excuse. "If the court determines that an objective observer *could* view race or ethnicity as a factor in the use of the peremptory challenge," the court shall deny the challenge and it shall explain its reasons on the record. GR 37(e) (emphasis added). Neither race nor ethnicity is defined in GR 37.[10]

"[A]n objective observer is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in Washington State." GR 37(f). The test in GR 37 involves an objective inquiry. *State v. Jefferson*, 192 Wn.2d 225, 249, 429 P.3d 467 (2018).[11] "For that reason, we stand in the same position as does the trial court, and we review the record and the trial court's conclusions . . . de novo."

---

[10] By comparison, the United States Census Bureau, based on instructions from the Office of Management and Budget, distinguishes between race and ethnicity. "The Census Bureau defines race as a person's self-identification with one or more social groups." https://www.census.gov/mso/www/training/pdf/race-ethnicity-onepager.pdf. For ethnicity, the 2020 census bureau asks if the person is of Spanish, Hispanic, or Latino origin. *Questions Asked on the Form*, U.S. Census 2020, https://2020census.gov/en/about-questions.html (last visited Oct. 26, 2020). The census bureau asks about no other ethnic groups. *Questions Asked on the Form*, *Supra*.

[11] Although *Jefferson* pre-dated the implementation of GR 37, it utilized the same test as the rule and rejected the test of *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), which was the rule at the time this case went to trial.

*Jefferson*, 192 Wn.2d at 250.  We, therefore, conduct de novo review to peremptory challenges of prospective jurors that are allegedly based on race or ethnicity.

In ruling, the court shall consider a nonexclusive list of circumstances, of which the following is relevant, "whether the party has used peremptory challenges disproportionately against a given race" by striking the only minority member of the jury pool.  GR 37(g)(v).[12]  GR 37 should also be read in conjunction with RCW 2.36.080(3) which prohibits the exclusion of a potential juror "on account of membership in a protected class recognized in RCW 49.60.030,"[13] and with Washington's Constitution, which prohibits questioning of a person based on religious beliefs.  WASH. CONST. art. I, § 11.

The application of these rules on appellate review is difficult.  I concur with the majority because GR 37 requires the peremptory challenge to be denied if an objective observer *could* view race or ethnicity as a factor in the use of the peremptory challenge, not whether we *would* or do

---

[12] My review of the record de novo demonstrates that none of the other circumstances listed in GR 37(g) could lead an objective observer to view race as a factor in the use of the peremptory challenge, and none is challenged by James Listoe.

[13] The protected classes in this statute are broader than those contained in GR 37.  "The right to be free from discrimination because of race, creed, color, national origin, citizenship or immigration status, sex, honorably discharged veteran or military status, sexual orientation, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability is recognized as and declared to be a civil right."  RCW 49.60.030(1).  In addition, it is unclear as to which category the test enunciated in *Jefferson* applies or if a traditional *Batson* test applies.

view race or ethnicity as a factor. In other words, the rule requires reversal when, based on pure speculation, an objective observer *could* view race or ethnicity as a factor in the use of the peremptory challenge.[14] The present case falls within these parameters.

I also find the application of de novo review to be difficult. I do not know how we can stand in the same position as the trial court when reviewing a cold record. In this case, James Listoe challenged the State's use of a peremptory challenge. The court then stated that the prospective juror "is an *apparent* minority member of our jury panel." 1 Report of Proceedings (RP) at 161 (emphasis added). In ruling on the challenge, Listoe stated that the challenged juror "was the only African American on the jury panel," and the court agreed that it "*appears* to be the case." 1 RP at 164 (emphasis added). The court then denied Listoe's challenge.[15] We cannot review these parts of the record de novo because we cannot observe the potential jurors.

The test for whether a person is of a particular race or ethnicity seems to be based on the visual observations of the court and the parties. It is not based on self-identification. I find the application of GR 37 in this matter to be challenging. I find it hard to imagine that any judge or

---

[14] Many people commented on this aspect of GR 37during the comment period prior to its adoption. *Comments for GR 37—Jury Selection*, WASH. CTS., https://www.courts.wa.gov/court_rules/?fa=court_rules.commentDisplay&ruleId=537 (last visited Oct. 26, 2020).

[15] I agree with the majority opinion that the trial court utilized an improper test, but since we review de novo, that is of no consequence in my reasoning.

lawyer would be able to determine every potential juror's race solely through visual observation.[16, 17]

A de novo review of the record on appellate review poses many problems. Although we are supposed to put ourselves in the position of the trial court, we are unable to view the jury panel. We are unable to determine the racial and ethnic make-up of the potential jurors de novo.[18] Therefore, we do not stand in the same place as the trial court.

In making this observation, I emphasize this point because, even if we accept that the challenged juror "appears to be the only African American," we do not know that he is. We cannot review the accuracy of that statement. In addition, I point out that "African American" may mean

---

[16] Mistaking a person to be a member of a racial group through visual observations is suspect. As an example, I point to the well-publicized case of Rachel Dolezal who formerly acted as president of the Spokane chapter of the National Association for the Advancement of Colored People (NAACP). She "identified as black" although her parents disagreed. Allison Samuels, *Rachel Dolezal's True Lies*, VANITY FAIR July 19, 2015), https://www.vanityfair.com/news/2015/07/rachel-dolezal-new-interview-pictures-exclusive; *Credibility of Local NAACP Leader Rachel Dolezal Questioned*, SPOKESMAN-REV., https://www.spokesman.com/stories/2015/jun/11/board-member-had-longstanding-doubts-about-truthfu/ (last updated June 11, 2015); *Family Says Spokane NAACP Head Falsely Portrays Herself as Black*, CHI. TRIB. (June 12, 2015), https://www.chicagotribune.com/nation-world/ct-spokane-naacp-president-race-20150611-story.html. Her physical appearance was of no help in determining her race or ethnicity. The same is true of a more recent case involving Jessica Krug. Michael Levenson, *Professor Investigated for Posing as Black Has Resigned, University Says*, N.Y. TIMES (Sept. 9, 2020), https://www.nytimes.com/2020/09/09/us/jessica-krug-george-washington-university.html. In addition, the 1961 non-fiction book *Black Like Me* by John Howard Griffin is illuminating on this topic.

[17] I would encourage everybody to review the following website, take the test, and see how difficult, if not impossible, it is to determine race and ethnicity based solely on observations. *Sorting People: Can You Tell Somebody's Race by Looking at Them?*, PBS, https://www.pbs.org/race/002_SortingPeople/002_00-home.htm (LAST VISITED OCT. 26, 2020).

[18] I underscore that viewing and determining the racial and ethnic composition of the jury is a problem in and of itself.

something different than Black.[19, 20]  The inquiry involves only having the parties and the judge identifying the race and ethnicity of the potential jurors, but does not consider how the jurors self-identify.[21]

In concurring, I want to be clear that I agree that we need to eliminate the unfair exclusion of potential jurors based on race or ethnicity.[22]  But I find appellate review of GR 37 to be difficult

---

[19] In a recent video podcast, Emmanuel Acho explained simply that not all black people in this country are African American and that many prefer to be called Black.  "The most simple and shortest answer is [calling Black people] 'black' because it's not only most accurate, it's also least offensive.  Keep in mind not all black people in America are African.  There are Jamaicans, there are Cubans, but also there's some black people that don't identify as African because that heritage got stripped from them during slavery."  Emmanuel Acho, *Episode 2: Featuring Matthew McConaughey*, UNCOMFORTABLE CONVERSATIONS WITH A BLACK MAN (undated), at 0 min., 54 sec. to 1 min., 14 sec., https://uncomfortableconvos.com/episode/episode-2.

[20] For a more thorough discussion on this issue, Cindy Adams, *Not all black people are African American.  Here's the difference.* CBS NEWS (June 18, 2020), https://www.cbsnews.com/news/not-all-black-people-are-african-american-what-is-the-difference/; John Elignon *A Debate Over Identity and Race Asks, Are African-Americans 'Black' or 'black'?*, N.Y. TIMES (June 26, 2020), https://www.nytimes.com/2020/06/26/us/black-african-american-style-debate.html.

[21] This issue becomes more complex if there is a challenge to an excused juror based on ethnicity.  In addition, even though GR 37 is not applicable to peremptory challenges that implicate gender-based discrimination, *Batson* applies.  *J.E.B v. Alabama ex rel T.B.*, 511 U.S. 127, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994).  However, the same issues identified above that only involve visual observations by the trial judge and the parties, are problematic for both appellate courts and trial courts.

[22] For a more detailed look at this issue, I recommend *Just Mercy: A Story of Justice and Redemption"* by Bryan Stephenson (2014).

and problematic.[23] Because an objective observer *could* have viewed race as a factor in the use of the peremptory challenge to Juror 17, I concur in the result.

_____
Melnick, J.

---

[23] I also want to be clear that I am not in any way supporting the elimination of peremptory strikes. They have a place in litigation, including but not limited to allowing parties to strike potential jurors who could not be excused for cause, but who may not get along with other jurors, or who may have, or think they have, specialized knowledge, or who may seem partial. They help select a well-balanced jury. Importantly, if the parties participate by selecting the jury, they will be more willing to accept its verdict.