**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| THE STATE OF WASHINGTON, | No. 83627-7-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| ROBERT JOE CHILDS, JR., | |
| Appellant. | |

BIRK, J. — Robert Childs, Jr. appeals a criminal conviction, asserting the superior court erred by allowing the State to exercise a peremptory challenge contrary to GR 37. This presents the question whether an objective observer could view race or ethnicity as a factor in the State's exercise of the challenge. Because we conclude an objective observer could view race or ethnicity as a factor, our determination of this question is dispositive and we reverse and remand for a new trial.

I

On the night of July 29–30, 2006, a concerned citizen escorted 12 year old J.H. to the Seattle Police Department's East Precinct based on his observation of J.H.'s evident distress. J.H. reported she had been approached by an unknown person, who had first addressed her from a vehicle and later contacted her as she walked down the street, where he forced her up against a wall and sexually assaulted her. Police were unable to find any witnesses to the incident at the

suspected crime scene. Seattle Fire Department personnel transported J.H. to Harborview Medical Center that night where medical staff found evidence of injury and collected forensic evidence suitable for deoxyribonucleic acid (DNA) testing. The Seattle Police Department logged the evidence into its custody on August 1, 2006. In April 2018, pursuant to a new state mandate, Seattle police sent the evidence for testing. Laboratory testing in May 2018 found seminal fluid and male DNA in J.H.'s clothing, which the police matched to Childs. By then living in Florida, when arrested Childs denied any incident occurring in July 2006 in Seattle and denied knowing J.H. Childs had been 30 years old in 2006.

In February 2019, the State charged Childs with second degree rape of child. At trial in June 2021, Childs disputed that J.H.'s descriptions given in 2006 matched him or his vehicle. Childs argued that the presence of his DNA on J.H.'s clothing showed only that at some point before the incident, he had been in contact with the clothing. The jury convicted Childs, and the trial court sentenced him to life without the possibility of release as a persistent offender based on prior sexual assault convictions from 1995, 1997, and 2001.

II

A

Childs's trial began on June 21, 2021, with jury selection over videoconferencing. Jury selection by this method proceeded in multiple successive small groups of prospective jurors joining an online meeting. The State posed the following question to the first jury panel: "Does anyone have any general tendency to trust or distrust the government in a case like this?" Juror 15

responded, "I honestly don't have a thought process. I do believe that the court system is a money system, so I don't know if this trial will be treated fair, but like I said, I'm keeping an open concept and an open mind about it." Juror 15 expressed concern about "politics behind the scene" and that with more convictions, the more money "you guys can get," but was unsure if this case was one of those types of cases. The prosecutor asked juror 15 to speak more about that, and juror 15 reiterated that he is open for listening to the evidence, but also said that he knew "how persuasive you all can be to force the conviction on someone, and, like, persuade jurors, and I just don't want it to be where an innocent person is getting charged for a crime that they know they didn't commit."

In his juror questionnaire, juror 15 had written that he had strong feelings about law enforcement, which the prosecutor asked him to address further. Juror 15 spoke about the unjust system that minorities face in the legal system, how those injustices are "all over the news now," and difficulty in trusting law enforcement, "who are supposed to be protecting us that's against us." Juror 15 stated,

> And then if you look at your prison system, [the] majority of your prisoners are of minority descent, as in African Americans or Latino based on the population. Sure, you can say there's more Caucasians that are in jail, but based on the population of minorities and everything in this country, the percentage is greater than what it would be. So there's no fairness in our system.

When asked if the race of the parties in this case would affect his ability to be fair and impartial, juror 15 stated that he will always be a fair person. The State asked juror 15 if his concerns on these issues would make it difficult to convict if he were

presented with enough evidence that he would believe meets the beyond a reasonable doubt standard. Juror 15 indicated he would not have that difficulty.

After the prosecutor questioned other jurors on following instructions on the law they might disagree with, how comfortable they would be in making a judgment as to whether the evidence meets the standard of proof beyond a reasonable doubt, what they would expect to happen after an incident like this is reported to the police, and making decisions as a group, the prosecutor returned to juror 15. The prosecutor asked juror 15 several questions, requesting juror 15 to describe his expectations of the anticipated evidence. At this point in the proceedings, the prospective jurors had been given no facts, but had been informed only that the matter involved the charge of rape of a child, the alleged incident occurred on or about July 29, 2006, J.H. was 12 years old at the time, Childs was at least 36 months older than J.H., and J.H. was not married to and not in a state registered domestic partner relationship with Childs.

When asked about the type of evidence he would expect to hear in "a case like this," juror 15 expressed uncertainty, but also mentioned a "rape kit" and "medical lab" to prove the rape and testimony of the witnesses if there were any witnesses. The prosecutor asked juror 15 if he would expect any eyewitness to a "charge like this" other than the victim, to which juror 15 said "definitely." Juror 15 stated that he believes that children like to fabricate a lot and although he can understand a child's parents pressing charges, juror 15 also believed it would be difficult if there was no medical evidence, such as "a doctor proving rape." Juror 15 also stated that he believes children and adults are equal in their ability to

4

fabricate, but noted that children might be more easily fooled because they are more innocent. After being asked whether he would expect these types of acts to be done around other people, juror 15 said no, but also was not sure if someone walked in and caught the act or if other people were involved but just did not say anything. Juror 15 reiterated that he would have to hear the case to actually give judgment on that. Juror 15 agreed child sexual abuse occurs.

After Childs's first round of questioning, the prosecutor resumed with juror 15. When asked whether he thinks all children fabricate, juror 15 responded that all children tell "little white lies," teenagers fabricate a lot more than any other age group, but not all fabricate. When asked for his thoughts on whether a 12 year old would fabricate an allegation like rape, juror 15 said that he does not know her "surroundings, living environment, her friends" or whether she is a "fast girl" or an "innocent girl." Juror 15 commented that he does not know the relationship between the child and the defendant, who could, for example, be a stepfather she does not like and "it could be any kind of made up story." Juror 15 agreed that those are factors he would consider when determining whether the child is fabricating or not.

The prosecutor then asked, "And so you said that kids fabricate particularly around this age, but you've also said that you could be fair. What is—what does that mean to you in this case?" Juror 15 explained that he would not trust a child telling him that she was assaulted when there is no evidence to prove that she was. He also believed he would question the child's story if she had been going to her parents and telling them beforehand and why "her parents allow[ed] her to

5

still be around this gentleman" and the parent's involvement in this is something to think about. Finally, juror 15 noted that medicine has come a long way where it can prove a rape to see if someone was really raped or not.

The prosecutor asked juror 15 to share how he would feel sitting on a case like this without the type of evidence he talked about. Juror 15 admitted that he will "kind of be uncomfortable" because "I just can't trust a child."[1] He explained, "[Y]ou don't know the situation with the child and that guy, and the child could potentially hate that guy and just want to, like destroy his life." And juror 15 stated kids that age come with a mentality that "I'll say he did such and such to me. That will get rid of him. They'll believe me." Juror 15 said he could not stand by that, because he saw it happen a lot of times with people and their lives have been ruined because children lied and just because they did not like those people.

The prosecutor again asked juror 15, given his "perspective," how he would hear the alleged victim's testimony and be fair. Juror 15 reiterated that he would hear both parties out, would like to hear the defendant's testimony, and said there are two sides to a story. When asked about his thoughts on the alleged victim, juror 15 stated, "[A]s it stands, she was raped," but also agreed that he would need more than just testimony, and he needs "factual evidence." He later added, "[W]ord of mouth is not actual facts to me." However, juror 15 tempered this statement when he was given the information that he could be instructed that testimony is considered evidence, he gets to decide the weight of that evidence,

---

[1] The report of proceedings incorrectly attributes certain of juror 15's statements to a different prospective juror. The parties agree the statements discussed here were juror 15's.

6

and testimony alone is sufficient if you give it that weight. When asked how that contingency would affect his views, juror 15 said he would need to hear the testimony to fully answer how he would feel.

Over defense counsel's objection, the prosecutor asked juror 15 to put himself in the prosecutor's shoes and asked if he would want himself as a juror on this case. Juror 15 stated, "[F]rom you[r] perspective, if I was in your shoes looking at me now" the prosecutor would not want him as a juror in this case. Juror 15 explained he is not trying to sabotage the State's case, but is "all for fairness" and "I'm not just going to throw this guy's life away without hearing his side of the story and having factual evidence." Juror 15 also expressed concern that this is "happening too much out there" and "[i]f this guy's innocent, we don't want to waste his life from a lie."

Juror 15 later said that despite his comments earlier concerning legitimate concerns about systemic harms in the criminal justice system, he was not concerned that was happening in this case. He felt that his fellow jurors were "pretty much fair" and "we will be the ones determining" the outcome of the case.

Childs began his questioning of juror 15 by asking about his employment as a manager at an ice cream shop. When asked about what skills he has in his job that he could bring as a juror on this type of case, juror 15 highlighted his patience and listening skills. He explained that he deals with children a lot, and they often take longer to order because of how many options they have to choose from. Defense counsel shared his concern that jurors may hear evidence of a forensic or scientific based nature, and if that happens, he feared that Childs would not be

7

able to get a fair trial because some jurors may give that more weight than other evidence. After he was asked for his thoughts on that, juror 15 said, "Like I said earlier, I think all of us are, from speaking to each other, pretty fair people. And like I said, I'll be very honest and listen to both sides of the party. I'm not just going to . . . just assume he's guilty."

In total, the prosecutor asked 28 substantive and clarifying questions of juror 15, which the record shows is more than the State's questioning posed to any other prospective juror. The next greatest number of questions posed to any one prospective juror by the State was 17 questions. Only four prospective jurors other than juror 15 were asked 10 questions or more, and the remaining 34 prospective jurors were asked fewer than 10 questions by the State.

Also during the first group of jurors in the videoconference jury selection, the prosecutor asked juror 3 about whether it would be a problem if the only eyewitness to the incident was the child. Juror 3 responded, "I'd like to say, like, I would have to side with the adult per se, just because if there's no other evidence, like, physical evidence . . . I can't be convinced beyond a reasonable doubt to convict per se, because at that point, it's a he-said, she-said." Juror 3 later recanted that statement, noting, "I think . . . kids are pretty brutally honest at times, and adults have more experience and can lean on that to try and, I guess, twist words to their benefit, and so since kids are pretty honest, I have to still instead of leaning on their testimony, still consider fact-based evidence." Juror 3 concluded, "I could also be persuaded by an adult or a kid, but it still comes down to the evidence." Juror 3 was empaneled on the final jury.

8

B

Outside the presence of the jury, the State moved to excuse juror 15 for cause. The prosecutor highlighted juror 15's belief that children fabricate, he would have difficulty believing the child, and he explained a number of reasons a child would fabricate. Additionally, the prosecutor argued that juror 15 would unfairly elevate the State's burden by requiring additional evidence beyond the testimony of the child. The prosecutor pointed to juror 15's comments that he needed certain types of additional evidence beyond the testimony of a child.

Childs objected on the ground that juror 15 had concerns but attested to being a fair person. He argued that juror 15 said he was going to be fair but would not necessarily outright believe an individual without more information. Childs noted that juror 15 wanted to hear both parties present evidence and indicated that he presumed Childs innocent. The defense did not believe that juror 15 demonstrated actual bias justifying a cause challenge and noted that juror 15 was the first panel's only juror who was of African American descent.

The trial court did not immediately rule on the cause challenge but turned sua sponte to GR 37 and summarized the responses and comments juror 15 provided. The trial court stated that "he's basically saying that he would not convict unless there was physical evidence,"[2] his desire to hear from both parties, his statement that he could not trust a child, his desire to see lab results or medical

_____

[2] As noted, this was not juror 15's statement after he was told he may be instructed that testimony is considered evidence. All his statements suggesting testimony is not evidence came before he was advised about the law's treatment of testimonial evidence.

9

evidence to prove that a rape happened because children fabricate, and "he does not understand" that the child testifying that the assault happened is evidence that she has been assaulted. The trial court denied the State's cause challenge and noted that although it did not know what the peremptory challenges were going to be, the trial court stated that a peremptory challenge is allowable. The trial court characterized the GR 37 ruling as "conditional."

C

Jury selection continued with later jurors appearing by subsequent videoconference meetings. The prosecutor asked what type of evidence they expected to hear in this type of case. Juror 54 stated, "I would probably expect to hear witness evidence and possibly forensic evidence." After being asked whether juror 54 felt like forensic evidence was necessary, juror 54 replied, "I think it would strengthen the case." Juror 54 reasoned that "people have a tendency to protect themselves, so I think that having maybe unbiased evidence or third-party evidence would strengthen a case."

Childs later asked juror 54 for thoughts on forensic evidence, and juror 54 replied, "My thoughts are that forensic evidence tends to be more stable and scientific." Childs asked if, hypothetically, forensic evidence is the only evidence that ties a person to an alleged incident and there is no other corroborating evidence, juror 54 responded, "I don't think that that would bother me" but it would also depend on the full case in the context of everything else that is presented. Juror 54 also agreed that "you need to listen to the facts and make a balanced decision." Juror 54 was empaneled on the final jury.

During individual questioning, the State asked juror 57, who had heard of Childs's case beforehand, if there were any concerns about his ability to put what he had previously heard aside and be fair and impartial to both parties. Juror 57 said, "There's also going to be that thought in the back of my mind, you know, I have to admit, I think that's always going to be there, but I can certainly try to be impartial in this particular case." The State asked if juror 57 understood that Childs is presumed innocent and that this presumption carries through unless the State presents evidence that proves Childs's guilty beyond a reasonable doubt. Juror 57 said he understood that.

Juror 57 expressed that he could hear evidence from both sides. After being asked by Childs's attorney if he would need the defense to present evidence as to why Childs is not guilty, juror 57 responded, "Yeah, I guess there would have to be some sort of evidence that says—that proves or shows that there's—he's not associated with this crime." Childs's attorney reiterated the instruction the trial court gave, that the State bears the burden of proof, and juror 57 said, "[S]o all the effort is going to come from the prosecution side to show guilt in this case. And without, I guess, any counter to that, I, you know, I guess it would have to rely only on what the prosecution has to present." The trial court excused juror 57 for cause based on juror 57's knowledge of Childs's background.

D

At the end of jury selection, the prosecutor exercised a peremptory challenge against juror 15. Childs's attorney objected based on Batson[3] and GR

---

[3] Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

37. The trial court stated, "I am, as I indicated yesterday, granting the peremptory for the reasons I put on the record yesterday. I am allowing it."

Before evidence began, the trial court followed up on the excusal of juror 15. In referencing a consideration under GR 37, the trial court was unaware of the prosecutor's use of peremptory challenges against a given race in past cases. The trial court observed, "[I]n the present case we have at least two minorities on the jury, one of whom is black." The trial court noted that two other jurors, 36 and 25, were subject to defense motions for cause, and the trial court did not believe the length of their questioning was any different than that of juror 15. The trial court stated that juror 25 was of Asian descent. The trial court noted that juror 27, a Black juror, was excused after a defense motion for cause. The trial court stated, "I actually think we have a fairly diverse panel at this point." Childs's attorney noted that juror 15 was the only Black juror remaining of the first 26 jurors.

III

A

Washington appellate courts have applied de novo review under GR 37 to determine whether an objective observer could conclude that race or ethnicity was a factor in a peremptory challenge. State v. Tesfasilasye, 200 Wn.2d 345, 355-56, 518 P.3d 193 (2022). In Tesfasilasye, the Supreme Court applied de novo review because "there were no actual findings of fact and none of the trial court's determinations apparently depended on an assessment of credibility." Id. The same is true here. Tesfasilasye left open the possibility that a standard of review other than de novo could apply in some GR 37 cases, but it did not define the

circumstances in which this would be appropriate. Neither party asserts that we should depart from the decisional law applying de novo review. Accordingly, we review the transcript of jury selection and apply GR 37 de novo.

B

The United States and Washington State Constitutions require an impartial jury. U.S. CONST. amend. VI; WASH. CONST. art I, § 22; Tesfasilasye, 200 Wn.2d at 356. The parties and the jurors have the right to a trial process free from discrimination. Powers v. Ohio, 499 U.S. 400, 409, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991). The constitutions require nothing else, but tradition, statutes and court rules created peremptory challenges. Tesfasilasye, 200 Wn.2d at 356. Parties may use these challenges to strike a limited number of otherwise qualified jurors without providing a reason. See RCW 4.44.130, .140; CrR 6.4(e). Peremptory challenges have a history of being used based on racial stereotypes. Tesfasilasye, 200 Wn.2d at 356. GR 37 was created to address this misuse of peremptory challenges and to overcome the shortcomings of Batson. Tesfasilasye, 200 Wn.2d at 357.

Under GR 37(c), a party or the court may object to the use of a peremptory challenge to raise the issue of improper bias. Upon objection to the exercise of a peremptory challenge pursuant to the rule, the party exercising the challenge must articulate the reasons that the peremptory challenge was exercised. GR 37(d). Then, the trial court must evaluate the reasons given to justify the peremptory challenge in light of the totality of circumstances. GR 37(e). GR 37(g) outlines a nonexhaustive list of several circumstances the trial court should consider. State

v. Listoe, 15 Wn. App. 2d 308, 321, 475 P.3d 534 (2020); State v. Lahman, 17 Wn. App. 2d 925, 936, 488 P.3d 881 (2021). GR 37(h) lists several presumptively invalid reasons for a peremptory challenge. Expressing a distrust of law enforcement or a belief that law enforcement officers engage in racial profiling is a presumptively invalid reason for a peremptory challenge. GR 37(h)(ii).

If the court determines that an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge, then the peremptory challenge must be denied, and the trial court should explain its ruling on the record. GR 37(e). The remedy for a GR 37 violation in a criminal case is reversal of the conviction. Tesfasilasye, 200 Wn.2d at 362; Lahman, 17 Wn. App. 2d at 938. This remedy applies regardless of the strength of the State's case or the hardship to victims or witnesses. Lahman, 17 Wn. App. 2d at 932.

In Tesfasilasye, the Supreme Court held that the trial court should have denied peremptory challenges exercised by the State against an Asian woman and a Latino. 200 Wn.2d at 347, 360, 361. The dismissal of the Asian juror concerned one of the presumptively invalid justifications. Id. at 359. The record indicated that that juror repeatedly indicated she could be fair and impartial, understood her role as a juror, and was willing to listen to the evidence before providing a verdict. Id. Tesfasilasye noted that the State did not seek to strike other jurors who shared similar personal experiences. Id. at 360. The Latino juror listed several kinds of evidence that he would like to see from the State to be convinced beyond a reasonable doubt, including eyewitnesses and DNA samples. Id. at 361. Tesfasilasye found this comment was based on the limited information the Latino

14

juror had at that point and a different juror made similar remarks about the need to have the whole picture before being able to reach a conviction, whom the State did not challenge.  Id.  Tesfasilasye reiterated that the court's determination under GR 37 should be based on whether an objective observer "could" view race as a factor, not whether the observer "would."[4]  Id.

C

Juror 15's initial comments expressed distrust of law enforcement, a presumptively invalid reason for a peremptory challenge under GR 37(h)(ii).  These comments were elicited based on the State having noted them in juror 15's questionnaire answers before jury selection began.  After these statements were elicited, the prosecutor spent time with other jurors before returning to extensive additional questioning of juror 15.  Of the circumstances outlined in GR 37(g), GR 37(g)(i), GR 37(g)(ii), and GR 37(g)(iii) are relevant to our inquiry here.

When conducting a GR 37 analysis, we should consider "the number and types of questions posed to the prospective juror, which may include consideration of whether the party exercising the peremptory challenge failed to question the prospective juror about the alleged concern or the types of questions asked about it."  GR 37(g)(i).  Under GR 37(g)(i), juror 15's comments that he wanted to hear from Childs because there are two sides to a story should not be held against him.

---

[4] Although it does not affect our de novo review, we note that the transcript in this case also shows the trial court describing the GR 37 standard as whether an objective observer "would" view race as a factor in the peremptory challenge, as opposed to "could" view.  While we independently perform the GR 37 analysis on review and use the "could-view" standard set forth in the rule and reiterated in Tesfasilasye, emphasis of the could-view standard by trial courts in the first instance aligns with the standard in the rule.

First, despite these comments, neither the prosecutor nor Childs's attorney reiterated, clarified, or explained that the burden of proof lies with the State, Childs is not required to testify, and the fact that a defendant does not testify cannot be held against him. This is significant since juror 57, who was in a later group of jurors, expressed the same views when individually questioned. The difference here is both the prosecutor and Childs's attorney immediately emphasized the trial court's instructions on this issue, and juror 57's views changed based on those reminders and explanations. The prosecutor did not similarly promptly advise juror 15 about the burden of proof and the law's treatment of testimonial evidence when juror 15 expressed views about possible evidence that appeared inconsistent with the law that would be set forth in the jury instructions. This difference in the questioning of juror 15 as compared with juror 57 is significant, and is not diminished merely because juror 57 was excused for cause for an unrelated reason.

Many of the State's questions inquired about juror 15's personal expectations of what the proof should be, though very few inquired about his willingness to accept the law's standards of proof. In challenging juror 15, the State relied on answers that did not accurately describe the controlling legal standards, but were made without juror 15's having been given any information about those standards. Juror 15 was generally not asked about his ability to apply those standards as opposed to whether he independently could correctly articulate them without guidance. In contrast, when juror 15 was asked how his views would be affected if he were instructed that the law views witness testimony as evidence,

juror 15 allowed the possibility that testimony would be sufficient to carry the burden of proof if given the necessary weight by the jury.

Under GR 37(g)(ii), we should also consider "whether the party exercising the peremptory challenge asked significantly more questions or different questions of the potential juror against whom the peremptory challenge was used in contrast to other jurors." Relevant to GR 37(g)(ii), the prosecutor asked juror 15 significantly more questions compared to other jurors who expressed similar reservations about the quality of the anticipated evidence, but who remained for the rest of the trial. Juror 3 was asked five questions by the State. Juror 54 was asked eight questions by the State. Juror 57 was asked nine questions by the State. Juror 9 was asked 17 questions, the most by the State after juror 15.

As discussed above, the majority of the questions the State asked juror 15 concerned juror 15's personal viewpoints on expectations of proof and credibility concerns of a child witness. Similar questions were rarely asked of other prospective jurors with so many follow up questions, if at all. No other prospective juror was asked for their thoughts on the alleged victim.

Finally, we should consider "whether other prospective jurors provided similar answers but were not the subject of a peremptory challenge by that party." GR 37(g)(iii). Under GR 37(g)(iii) and similar to the Latino juror in Tesfasilasye, juror 15's views on the possible evidence were similar to those of other prospective jurors. Jurors 54 and 3, who both were empaneled on the final jury, expressed a preference for forensic evidence because of beliefs it would, as juror 54 put it, "strengthen the case" and be unbiased evidence compared to a case of, as juror

17

3 put it, "he-said, she-said." However, just as juror 54 agreed, "[Y]ou need to listen to the facts and make a balanced decision," so too juror 15 repeatedly stated that he would be fair to both sides. Initially, juror 15 stated word of mouth is not "actual facts" to him. But when he was told the law viewed testimony differently, jurors decide its weight, and testimony alone is sufficient if given the necessary weight, juror 15 said he would need to hear the testimony before determining how he would feel about being instructed that testimony is evidence. The Latino juror wrongfully excused in <u>Tesfasilasye</u> made similar remarks to those of juror 15 here.[5]

Juror 15 and juror 3 both shared beliefs about a child's potential to fabricate. Both jurors expressed concern that without extrinsic, physical evidence, such as laboratory testing, relying solely on testimony would present an issue of deciding the case based on the child's word against the adult's. Juror 3 later recanted this portion of the previous answer, stating, "[K]ids are pretty brutally honest at times" and adults have more experience, but reiterated, "I have to still instead of leaning on their testimony, still consider fact-based evidence." Juror 15 expressed similar comments and continued to reiterate his ability to be fair to both parties. Moreover,

---

[5] Although again not a factor in our de novo review, we observe that the trial court's sua sponte GR 37 analysis at the time the State challenged juror 15 for cause, before the State made a peremptory challenge, and before jury selection was complete, prevented the court from fully considering both the "totality of the circumstances" under GR 37(e) and all of the circumstances under GR 37(g). GR 37(g)(ii) and GR 37(g)(iii) require the court to compare the treatment of the juror the party exercised the peremptory against to the treatment of other jurors. The trial court's initial "conditional" GR 37 analysis did not benefit from either the entirety of jury selection or a comparison of the questioning of jurors 54 and 57, who had not yet appeared during the videoconference jury selection. The trial court also did not revisit these circumstances after the final jury was empaneled and before evidence began.

juror 15's expressions about skepticism of a witness's uncorroborated statements all came in the context of his hypothesizing reasons for the witness to fabricate. Juror 15's remarks that he would be very honest, listen to both sides, and would not just assume Childs is guilty, conformed to the presumption of innocence.

When considering the "totality of the circumstances" under GR 37(e), juror 15 initially articulated only a presumptively invalid basis for the use of a peremptory challenge. He was questioned much more extensively by the State than any other prospective juror, and was invited to speculate both about the controlling legal standards and the anticipated proof only to have those speculations used against him when they did not correspond to facts juror 15 had no basis to know. Juror 15 was equally emphatic as actually empaneled jurors about his ability to be fair to the evidence without prejudging it and was not given the same leeway to rehabilitate himself when informed of the correct legal standards. We conclude an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge against juror 15, GR 37(e), and the trial court erred by permitting the challenge. Because a GR 37 error requires a new trial, we need not reach the issues Childs raises in his statement of additional grounds.

Reversed and remanded.

_Birk, J._

WE CONCUR:

_Coburn, J._          _Bowman, J._

19