[No. 40344-7-II.   Division Two.   May 8, 2012.]

THE STATE OF WASHINGTON, *Respondent*, v. MICHAEL ANTHONY MEE, *Appellant*.

*Steven Witchley* (of *Ellis Holmes & Witchley PLLC*), for appellant.

*Mark E. Lindquist, Prosecuting Attorney*, and *Stephen D. Trinen, Deputy*, for respondent.

¶1 VAN DEREN, J. — Michael Anthony Mee appeals his convictions for first degree murder by extreme indifference[1] and unlawful possession of a firearm. In the published portion of this opinion we discuss Mee's argument that the trial court abused its discretion by denying his motion to exclude evidence of his gang affiliation. In the unpublished portion, we address Mee's argument that the trial court abused its discretion by (1) instructing the jury that it had to be unanimous in order to answer "no" to the question on the firearm enhancement special verdict form, (2) denying defense counsel's request to question the jury about alleged juror misconduct, and (3) denying his motion

---

[1] RCW 9A.32.030(1)(b) provides, "A person is guilty of murder in the first degree when . . . [u]nder circumstances manifesting an extreme indifference to human life, he or she engages in conduct which creates a grave risk of death to any person, and thereby causes the death of a person."

for a mistrial based on the alleged juror misconduct. We hold that the trial court abused its discretion in finding the gang-related evidence more probative than prejudicial under ER 403 and in admitting it as evidence of motive, but because the error was harmless in the context of overwhelming untainted evidence that Mee fired toward Crystal Roberts' home when he knew that people were present both inside and outside the house at a birthday party, and that a bullet struck Tracy Steele, killing him, we affirm Mee's convictions.

## BACKGROUND

¶2 On May 9, 2008, Tracy Steele celebrated his 32nd birthday with his fiancée at his fiancée's home in Tacoma, Washington. Steele left his fiancée's home that evening with his fiancée's aunt, Crystal Roberts, to attend another party at Roberts' home in Tacoma. Roberts invited only family members to her party. D'Andre Sullivan, father of Roberts' children, also lived in the home. Roberts described the party's atmosphere as normal with "[m]usic, food, [and] everybody . . . just having a good time." Report of Proceedings (RP) at 506. The atmosphere changed, however, when uninvited guests Charles Pitts and Jason Greer arrived.[2] Pitts and Sullivan had known each other since they performed music together when they were younger. According to Roberts, Pitts was a "troublemaker" and a member of the Lakewood Hustler Crips gang. RP at 507.

¶3 Roberts believed that Greer left the party after a couple of minutes but that Pitts stayed.[3] Pitts' behavior toward the party guests was disrespectful, calling Roberts' sister a "tall A-S-A-B-I-T-C-H," and telling Roberts that one of her children did not look like the father. RP at 509.

---

[2] Pitts' nicknames were "Shotty" and "Big Shotty." RP at 297. Greer's nicknames were "Scram" and "Gutter." RP at 506, 874.

[3] Greer testified that he did not leave the party until later that evening.

Roberts told Pitts to leave, and Pitts asked Sullivan if he could use Sullivan's telephone to call for a ride.

¶4 Mee, who referred to himself as "Little Shotty," showed up at Roberts' house driving Tanya Satack's car. A teenage male who went by the name "Little Shotty Deuce" and three females, including Satack, were in the car with Mee. Mee stopped the car in a manner that caused Sullivan to confront Mee and tell him not to disrespect the neighborhood. Mee responded that he "wasn't scared of anyone," and he uttered the terms " 'cuz' " and " 'loc.' "[4] RP at 517.

¶5 About 15 minutes after Mee appeared at Roberts' house, four women in a second vehicle drove up. The women in the second car asked Mee why he was there with those "white bitches." RP at 879-80. Mee argued with the women in the second car and told them to leave; Sullivan also told them to leave.

¶6 While Mee and Sullivan were talking, Mee put his hands on Sullivan's chest. Upon seeing this, Sullivan's stepbrother, DeShawn Henry, ran out of the house and hit Mee. A fight broke out and at some point Steele hit Mee. Pitts did not become physically involved in the fight but repeatedly told everyone, "[T]hose are my little homeboys." RP at 529. As the fight ended, Mee yelled at the top of his voice that he was going to come back. He left with the people who had come with him, but Pitts stayed at Roberts' house. Shortly after Mee left the party, he called Greer and told him that someone had "jumped" him and that "Shotty just let him do it and didn't do anything." RP at 951.

¶7 That same evening, Marjorie Morales was drinking liquor in the garage of Hokeshina Tolbert's house in Tacoma with Tolbert, Dan Bluehorse, Jose Cota Ancheta, and Jesus

---

[4] Trial testimony revealed that "cuz" and "loc" are terms unique to Crip gang members. RP (Dec. 10, 2009) at 80. "Cuz" is generally a term Crip gang members use to refer to other Crip gang members, and "loc" is a term meaning crazy. RP at 517.

Cota Ancheta.[5] When they started drinking, they were looking at and passing around a rifle. Mee came to Tolbert's house later that evening with the others who had been in the vehicle at Roberts' home. Mee was the only one who got out of the car. Mee told the people in the garage that he "got jumped by some people." RP at 723. Mee and the drinking group then discussed how they would retaliate; some wanted to go to Roberts' party and fight, but Mee indicated that he wanted to go and shoot. Bluehorse told Tolbert to get the rifle. According to Tolbert, he grabbed the rifle from the garage and set it down in the yard, and Mee picked it up. According to Jose and Morales, Tolbert or Bluehorse handed the rifle to Mee.

¶8 Mee, Jesus, Bluehorse, and Morales got into Morales' car, with Jesus driving. Jose sensed that something bad was going to happen and began to walk away down an alley, but Morales' car quickly caught up to him, and Jesus told him to get in. Tolbert got into Satack's car and told Satack to follow Morales' car. Both cars headed toward Roberts' home.

¶9 As they approached Roberts' home in the vehicle, Jesus turned the car lights off. Jesus stopped the car in front of Roberts' home, and Mee leaned out the window with the rifle and shot two or three times. After the last shot, Jesus drove back to Tolbert's house. Satack lost sight of Morales' car before it got to Roberts' home and, after hearing gunshots nearby, turned her car around and drove away. Moments later, Satack saw Morales' car and followed it back to Tolbert's home.

¶10 Steele, Sullivan, Pitts, and others were outside Roberts' house when Mee fired the rifle. When he heard the gunshots, Sullivan ran into the house and yelled for everyone to get down. Everyone in the house took cover, and

---

[5] Tolbert is an admitted member of the Native Gangster Crips. Bluehorse admits that he was a member of the Native Gangster Crips. Jesus and Jose Cota Ancheta are brothers. We refer to Jesus and Jose Cota Acheta by their first names for clarity. Jose admits that he was a member of the Native Gangster Crips; Jesus did not testify at Mee's trial.

Roberts shoved her children under a bed. A little while later, Sullivan heard a knock at the door. When he answered the door, he saw Steele. Steele ran into the house, shook his head, went to the bathroom, and collapsed. Roberts could see that Steele had been shot.

¶11 Steele died from internal bleeding as a result of the gunshot wound. The State charged Mee with first degree murder by extreme indifference and unlawful possession of a firearm.

¶12 Before trial, the State filed a motion for an order allowing it to admit gang-related evidence under ER 404(b). Specifically, the State sought to introduce evidence that Mee was a member of the Lakewood Hustler Crips and that other individuals involved in the shooting were members of the Native Gangster Crips. The State also sought to admit evidence of the gang names of various individuals involved in the shooting incident, gang-related slang terminology, typical gang-member behaviors and expectations, and the culture of not cooperating with the police because of gang membership or fear of retaliation from gang members.

¶13 The State argued that the gang-related evidence was admissible at trial to prove motive, res gestae, knowledge, and identity. Specifically, the State indicated that it sought to introduce the gang-related evidence for the following reasons: (1) some witnesses knew Mee and other individuals involved in the shooting only by their "street names" or nicknames; (2) Mee may have intended to shoot fellow Lakewood Hustler Crips gang member Pitts because Pitts did not come to Mee's aid when Mee was beaten at the party; (3) some people in the vehicle with Mee were wearing gang-related bandanas when the shooting occurred; (4) some witnesses were reluctant to cooperate with police because they did not want to be a "snitch[ ]," and because Pitts threatened a witness about testifying at trial; (5) to explain how Mee knew where to obtain a gun; (6) to explain why the shooting was a group effort as opposed to Mee acting alone; (7) to "present the accurate truthful story to

the jury"; (8) to "dispel some sort of misunderstanding that the Crips are all on the same side"; and (9) to show Mee's possible motive in targeting Pitts for failing to assist him at Roberts' house, as gang rules required. RP at 82-85, 90. Mee objected to the admission of gang-related evidence, arguing that the evidence was not relevant and was unduly prejudicial.

¶14 The trial court ruled that the gang-related evidence was admissible to establish Mee's motive. The trial court noted that the State's offer of proof, if supported by the evidence at trial, would establish Mee's gang status and other gang evidence by a preponderance of the evidence, thus supporting its admission. The trial court concluded that it was unnecessary to conduct an evidentiary hearing at that time, but it noted that if the evidence at trial did not conform to the State's offer of proof, it would entertain the possibility of a mistrial.

¶15 Several witnesses testified that they knew Mee only by his nickname "Little Shotty" and that they knew other individuals involved in the shooting only by their nicknames. Tolbert testified about gang nicknames, indicating that "Big A would be—the person who started the name. Little A would be the person that is under them . . . and then it keeps going smaller and smaller, baby, deuce." RP (Dec. 10, 2009) at 75. Tolbert also testified that gang members are expected to assist a fellow gang member in a fight and that failing to assist a fellow gang member results in a loss of respect. Jose testified that a gang member's failure to assist a fellow gang member in a fight would result in the member having to fight members of their own gang. Jose further testified that a gang member who failed to support a fellow gang member in a fight would lose respect, while a gang member who assisted a fellow gang member in a fight would gain respect. Based on Jose's and Tolbert's testimony, the State indicated that it did not need to call its expert gang witness.

¶16 Mee timely appeals his convictions for first degree murder by extreme indifference and challenges the special

verdict unanimity instruction. He also challenges the trial court's denial of his request to question a juror during deliberations and denial of his motion for a mistrial based on juror misconduct.

## ANALYSIS

### GANG-RELATED EVIDENCE

¶17 Mee contends that the trial court abused its discretion by allowing the State to admit gang-related evidence in violation of ER 404(b). Specifically, Mee argues that the trial court abused its discretion by admitting the gang-related evidence under the motive exception to ER 404(b) because motive is not an element of first degree murder by extreme indifference. Mee also contends that the trial court abused its discretion by failing to exclude the gang evidence under ER 403. Following our decision in *State v. Yarbrough*, 151 Wn. App. 66, 210 P.3d 1029 (2009), we hold that a trial court may, under appropriate circumstances, admit ER 404(b) gang evidence to establish a defendant's motive for committing first degree murder by extreme indifference. But because the gang-related evidence here had little probative value and was highly prejudicial, we also hold that the trial court abused its discretion by admitting the gang-related evidence.

¶18 We review a trial court's decision to admit evidence of other crimes or misconduct for an abuse of discretion. *State v. Pirtle*, 127 Wn.2d 628, 648, 904 P.2d 245 (1995). A trial court abuses its discretion when its decision is manifestly unreasonable or is based on untenable grounds or reasons. *State v. Brown*, 132 Wn.2d 529, 572, 940 P.2d 546 (1997).

¶19 Evidence of other crimes, wrongs, or acts is not admissible to prove character or conformity with it, but it may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge,

identity, or absence of mistake or accident. ER 404(b). Before a trial court may admit evidence of other crimes or misconduct, it must (1) find by a preponderance of the evidence that the misconduct occurred, (2) determine whether the evidence is relevant to a material issue, (3) state on the record the purpose for which the evidence is being introduced, and (4) balance the probative value of the evidence against the danger of unfair prejudice. *State v. Kilgore*, 147 Wn.2d 288, 292, 53 P.3d 974 (2002). "ER 404(b) is not designed 'to deprive the State of relevant evidence necessary to establish an essential element of its case,' but rather to prevent the State from suggesting that a defendant is guilty because he or she is a criminal-type person who would be likely to commit the crime charged." *State v. Foxhoven*, 161 Wn.2d 168, 175, 163 P.3d 786 (2007) (quoting *State v. Lough*, 125 Wn.2d 847, 859, 889 P.2d 487 (1995)). ER 404(b) must be read in conjunction with ER 403. *State v. Smith*, 106 Wn.2d 772, 775, 725 P.2d 951 (1986). "ER 403 requires exclusion of evidence, *even if relevant,* if its probative value is substantially outweighed by the danger of unfair prejudice." *Smith*, 106 Wn.2d at 776.

A. Reliance on the State's Offer of Proof To Establish the Fact of Misconduct

¶20 As an initial matter, Mee contends that the trial court abused its discretion by ruling that the ER 404(b) gang evidence was admissible without conducting an evidentiary hearing to determine whether the State could prove its claimed gang evidence and its relevance by a preponderance of the evidence. We disagree because the trial court relied on the State's offer of proof to establish the admissibility of the gang-related evidence and instructed counsel that the State's evidence during trial must support the offer of proof that the conduct occurred or the State would face a mistrial.

¶21 Our Supreme Court has held that in ruling on the admissibility of evidence under ER 404(b), a trial court may

rely on the State's offer of proof to establish the fact of misconduct by a preponderance of the evidence. *Kilgore*, 147 Wn.2d at 294-95. The court reasoned:

> Requiring an evidentiary hearing in any case where the defendant contests a prior bad act would serve no useful purpose and would undoubtedly cause unnecessary delay in the trial process. In our view, these hearings would most likely degenerate into a court-supervised discovery process for defendants. . . . We believe, in the final analysis, that the trial court is in the best position to determine whether it can fairly decide, based upon the offer of proof, that a prior bad act or acts probably occurred.

*Kilgore*, 147 Wn.2d at 294-95. Our Supreme Court has thus approved the procedure the trial court employed here, and Mee does not provide any contrary authority. Accordingly, the trial court did not abuse its discretion in admitting the ER 404(b) evidence in reliance on the State's offer of proof, subject to confirming the proffered evidence during trial.

### B. Motive

¶22 Mee also contends that the trial court abused its discretion by finding the gang-related evidence relevant to prove motive because motive is not an element of first degree murder by extreme indifference. Because prior case law has established that the State may present evidence of a defendant's motive to commit first degree murder by extreme indifference, we disagree.

¶23 To convict Mee of first degree murder by extreme indifference, the State had to prove beyond a reasonable doubt that (1) Mee acted with extreme indifference, an aggravated form of recklessness; (2) he created a grave risk of death to others; and (3) his actions caused the death of a person. RCW 9A.32.030(1)(b); *Yarbrough*, 151 Wn. App. at 82-83 (citing *State v. Pastrana*, 94 Wn. App. 463, 470, 972 P.2d 557 (1999)).

¶24 In *Yarbrough*, we held that the trial court did not abuse its discretion by admitting gang-related evidence

to prove the defendant's motive for committing first degree murder by extreme indifference, even though motive was not an element of the crime. 151 Wn. App. at 84. We relied on *State v. Boot*, 89 Wn. App. 780, 950 P.2d 964 (1998) in holding that motive may be relevant to prove the crime of first degree murder by extreme indifference: " '[A]lthough the State is not required to prove motive as an element of [aggravated first degree murder], evidence showing motive may be admissible' if 'the evidence is relevant and necessary to prove an essential element of the crime charged.' " *Yarbrough*, 151 Wn. App. at 83 (first alteration in original) (quoting *Boot*, 89 Wn. App. at 789).

¶25 Mee acknowledges our decision in *Yarbrough*, which rejected the same argument he raises here. But Mee contends that *Yarbrough* was incorrectly decided, and he requests that we overturn our previous decision, asserting that *Yarbrough* relied on an improper interpretation of previous case law, including *State v. Athan*, 160 Wn.2d 354, 158 P.3d 27 (2007) and *State v. Powell*, 126 Wn.2d 244, 893 P.2d 615 (1995). Mee contends that *Athan* and *Powell* stand for the proposition that "where only *circumstantial* evidence exists indicating an accused is guilty of murder, evidence of that accused's motive to kill the victim *may* be admissible in some cases." Opening Br. of Appellant at 29. Mee bases his interpretation on a quote in *Athan*, which reads, "Although motive is not an element of murder, it is often necessary when only circumstantial evidence is available." 160 Wn.2d at 382 (citing *Powell*, 126 Wn.2d at 260).

¶26 But Mee reads the quote too broadly and, contrary to Mee's contentions, *Athan* and *Powell* do not support his argument that evidence of motive is irrelevant when the State has direct evidence of the defendant's guilt. As the State correctly points out, the statement quoted in *Athan* was in the context of an analysis of the applicability of the state of mind exception to the hearsay rule and did not consider the issue under ER 404(b). 160 Wn.2d at 382-83.

¶27 *Powell* considered the admission of ER 404(b) evidence in a spousal murder case. 126 Wn.2d at 259. There,

our Supreme Court stated, "[M]otive goes beyond gain and can demonstrate an impulse, desire, or any other moving power which causes an individual to act." *Powell*, 126 Wn.2d at 259. The *Powell* court defined "motive" as " '[c]ause or reason that moves the will . . . An inducement, or that which leads or tempts the mind to indulge a criminal act. . . . [T]he moving power which impels to action for a definite result . . . that which incites or stimulates a person to do an act.' " 126 Wn.2d at 259 (some alterations in original) (quoting *State v. Tharp*, 96 Wn.2d 591, 597, 637 P.2d 961 (1981)).

¶28 Moreover, ER 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Whether evidence of a defendant's motive tends to make the existence of any consequential fact more or less probable does not depend on direct evidence of the defendant's guilt. Because Mee fails to demonstrate that the rule set forth in *Yarbrough* is incorrect, we decline to overturn it. *State v. Devin*, 158 Wn.2d 157, 168, 142 P.3d 599 (2006).

## C. ER 403

¶29 Although we decline to overturn our decision in *Yarbrough* and we reject Mee's contention that the State may not present ER 404(b) evidence to establish a defendant's motive on a charge of first degree murder by extreme indifference, we hold that under the facts and evidence presented in this case, the trial court abused its discretion in admitting the gang-related evidence because the danger of unfair prejudice substantially outweighed its probative value.

¶30 Before a trial court may admit prior bad acts evidence under ER 404(b), it must find that the probative value of the evidence substantially outweighs the danger of unfair prejudice under ER 403. *See, e.g., State v. Fisher*, 165

Wn.2d 727, 745, 202 P.3d 937 (2009); *Smith*, 106 Wn.2d at
775-76. ER 403 states, "Although relevant, evidence may
be excluded if its probative value is substantially out-
weighed by the danger of unfair prejudice, confusion of the
issues, or misleading the jury, or by considerations of undue
delay, waste of time, or needless presentation of cumulative
evidence."

¶31 To establish Mee's motive to commit first
degree murder by extreme indifference, the State presented
testimony from Tolbert, an admitted member of the Native
Gangster Crips, that gang members are expected to assist
fellow gang members in a fight or risk losing respect. The
State presented similar testimony from Jose, an admitted
former member of the Native Gangster Crips, that gang
members who fail to assist a fellow gang member lose
respect and, as a consequence, may be expected to fight
members of their own gang. Based on Tolbert's and Jose's
testimony regarding the general rules of their "gang cul-
ture," the State argued in closing that Mee, an alleged
member the Lakewood Hustler Crips, committed first de-
gree murder by extreme indifference because based on the
Native Gangster Crips gang members' understanding of
their gang rules, Mee wanted to target Pitts, also an alleged
member of the Lakewood Hustler Crips, for Pitts' failure to
assist Mee in a fight. The State told the jury:

> Everybody, every aspect, every witness in this case says the
> same thing. The defendant is upset. He got jumped. Shotty
> didn't have his back and that's a huge thing in the gang world.
> In his mind, Shotty had to help him. And the defendant, for
> street credibility, for every reason that you came to understand
> after this long explanation and details about the culture out
> there, he cannot take it. He cannot just go away because then
> he is the punk and that's not his personality on this particular
> evening, that's not his way of dealing with the situation.

> It may be foreign to other people, but in that world as you can
> readily tell, that's all it takes to get . . . Steele killed. And if it's
> not [Steele] that the gun[ is] being fired at, it's [Sullivan], and

if it's not [Sullivan], maybe the primary target is . . . Pitts . . . for not assisting. That punk, I'll show him.

RP at 1870-71.

¶32 Eyewitnesses to Mee's conduct and evidence from others who participated in the events made it clear that Mee shot a rifle two or three times indiscriminately at a residence where a birthday party was underway with people both inside and outside the home. This evidence was overwhelming and undisputed. Tolbert's and Jose's testimony that in general, gang members are expected to assist other gang members in a fight or risk losing respect was irrelevant to prove that Mee killed Steele by extreme indifference by firing the gun into the house. The State's evidence of "gang culture" rules was extremely prejudicial because it invited the jury to make the "forbidden inference" underlying ER 404(b): that Mee's gang membership showed his propensity to commit the charged crimes. *State v. Wade*, 98 Wn. App. 328, 336, 989 P.2d 576 (1999).

¶33 Simply put, generalized evidence regarding the behavior of gangs and gang members, absent (1) evidence showing adherence by the defendant or the defendant's alleged gang to those behaviors and (2) a finding that the evidence relating to gangs is relevant to prove the elements of the charged crime, serves no purpose but to allow the State to "suggest[ ] that a defendant is guilty because he or she is a criminal-type person who would be likely to commit the crime charged." *Foxhoven*, 161 Wn.2d at 175. Thus, the trial court abused its discretion by admitting the gang evidence because the danger of unfair prejudice substantially outweighed the probative value.[6]

---

[6] In holding that the trial court abused its discretion by admitting the gang-related evidence under ER 403, we briefly address the State's argument that the gang-related evidence was admissible to prove identity, knowledge, and the res gestae of the crime. *See State v. Burkins*, 94 Wn. App. 677, 689, 973 P.2d 15 (1999) (reviewing court may affirm a trial court's ER 404(b) ruling on any correct ground). Regarding identity, the gang-related evidence was highly prejudicial and had little probative value in establishing the identity of Mee or the other participants because evidence of Mee's and the other participants' nicknames is

¶34 But we conclude that the trial court's abuse of discretion in admitting the gang-related evidence was harmless in light of the evidence in this case. The erroneous admission of prior bad acts evidence under ER 404(b) "requires reversal only if the error, within reasonable probability, materially affected the outcome of the trial." *State v. Halstien*, 122 Wn.2d 109, 127, 857 P.2d 270 (1993). Here, the gang culture evidence did not materially affect the outcome of Mee's trial in light of the overwhelming evidence establishing Mee's guilt. Several witnesses who admitted their participation in the shooting established that Mee (1) got the gun from Tolbert; (2) got in the car with others to drive to the house and shoot; and (3) fired the rifle at Roberts' house where he knew a number of people were at a birthday party, with the result that a bullet struck Steele and killed him. This is overwhelming evidence of Mee's culpability for the charged crimes. And this evidence remains untainted by the trial court's erroneous admission of gang-related evidence. Accordingly, there is no reasonable probability that the jury's ultimate verdict was materially affected by the gang-related evidence; thus, its admission in this case was harmless.

¶35 In holding that the trial court abused its discretion by admitting gang-related evidence, we note that trial courts should be particularly cautious when weighing the probative value of gang-related evidence against its

not inextricably tied to their gang affiliation. The State does not explain in its brief why the gang-related evidence was necessary to establish knowledge, but in its motion to admit gang-related evidence at the trial court the State asserted the gang-related evidence was necessary to establish how Mee knew where to find a gun. Even assuming that Mee's knowledge of how to obtain a gun was relevant to any essential element of the charged crimes, the gang-related evidence was highly prejudicial and had little probative value because Mee's knowledge of how to obtain a gun may be inferred by the fact that he did obtain a gun. Finally, although the gang-related evidence was relevant to show the res gestae of the crime, any probative value in the gang-related evidence was outweighed by the danger of unfair prejudice under the facts of this case. Here, the State's evidence from several witnesses was that they saw Mee get in a fight at a party, that he was clearly upset, and that he returned a short time later and fired a rifle from the car, killing Steele. Gang-related evidence was thus not relevant to the elements of this crime.

inherently prejudicial effect. As this case exemplifies, admitting testimony about gangs in general allows the State to argue from that generalized evidence that an individual gang member engaged in the charged criminal conduct because of gang membership. Juries are then encouraged to assume that the defendant adheres to the stereotyped gang actions. Accordingly, the admission of gang evidence may result in a guilty verdict influenced by highly prejudicial propensity evidence, contrary to the principles of a fair trial. That we hold the admission of this evidence did not unfairly prejudice Mee here is entirely dependent on the powerful untainted evidence of his actions related by the other participants in the shooting.

¶36 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

WORSWICK, A.C.J., and ARMSTRONG, J., concur.

Review denied at 175 Wn.2d 1011 (2012).