# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 57282-6-II |
| Respondent, | |
| v. | |
| MICHELLE M. OSBORN, | UNPUBLISHED OPINION |
| Appellant. | |

PRICE, J. — Michelle M. Osborn appeals her conviction for one count of attempted first degree robbery committed against an intimate partner.

During jury selection, Osborn objected to one of the State's peremptory challenges on "Juror 4" under GR 37, arguing that an objective observer could view race or ethnicity as a factor in the State's exercise of the peremptory challenge. The trial court overruled the objection. Also pretrial, Osborn moved to have certain text messages that purportedly expressed suicidal ideation redacted because their prejudicial nature outweighed their probative value. The trial court, again, denied Osborn's request and the text messages were admitted at trial.

Osborn argues that the trial court erred in both decisions. We disagree and affirm.

FACTS

I. BACKGROUND

Early one March morning in 2022, a man knocked on the door of Jason Klarich's trailer. Jason's father, Jerry, was living with Jason at the time.[1] Jerry heard a knock on the door and opened it. He saw a man wearing a fluffy jacket, a hoodie, and a mask over his face and holding a gun in his right hand. The man said he was a debt collector and demanded the wallets and keys of both Jerry and Jason. Jason heard the commotion and pushed his father aside to confront the man.

But soon, Jerry came back to the door with his own gun pointed at the man and told him to drop his gun. The man briefly hesitated, then appeared to be lifting the gun; Jerry shot him. After being shot, the man ran toward the highway and got into a waiting car. Jason saw the man make a waiving motion as he was approaching the car. The car immediately drove away. The man was later identified as Mason Archer-Barrett.

Jason and Jerry recognized the car as belonging to Osborn, Jason's ex-girlfriend. Law enforcement located Osborn's car at a nearby hotel, and she was arrested after attempting to flee through a hotel window. After her arrest, Osborn agreed to a recorded interview with law enforcement. During the interview, Osborn said she saw the injured man, Archer-Barrett, on the road and gave him a ride to the hospital. But she did not disclose she knew him.

Jason had met Osborn several months before the attempted robbery and had ended his relationship with her a week before. According to Jason, nothing good happened in the

---

[1] Because the Klarichs share the same last name, we refer to them by their first names for clarity. We intend no disrespect.

relationship and his life was in shambles by its end. Jason recalled that the relationship with Osborn turned into chaos one night when, after Osborn yelled at him, he decided to leave and sleep in his truck. When he returned home, Jason claimed that some of his things in his trailer were broken. After another argument, Jason again left his trailer and returned to find several other things of his destroyed. As a result, Jason decided to end the relationship with Osborn. But they continued to communicate by text.

After Osborn's arrest, law enforcement seized her phone and extracted data from it, including numerous text messages. In the days leading up to the attempted robbery, Osborn sent Jason over a hundred text messages. On one day in particular, Osborn sent dozens of lengthy emotional messages to Jason. The State prepared a redacted report of the text messages extracted from Osborn's phone.

Following its investigation, the State charged Osborn as an accomplice to one count of attempted first degree robbery with a special allegation of domestic violence committed against an intimate partner.

II. OSBORN'S PRETRIAL REQUEST TO REDACT MESSAGES REFERENCING PURPORTED SUICIDAL IDEATION

Prior to trial, the parties discussed the admissibility of the numerous text messages. Some of these messages alleged that Jason was using drugs. The parties agreed to redact references to these allegations.

However, the parties disagreed whether several other text messages should be redacted. Osborn made an oral request to redact several of the text messages that purportedly made

references to suicidal ideation.[2]  The text messages that Osborn requested to redact were texts from

Osborn to Jason.  They stated,

> I hope you can ask yourself every single day how much you can push somebody else to the point where they break cuz you finally did that to me[.]  I was already at a point where I was already in a hard place and you just made it so much harder on me and more difficult that I don't even want to exist and it is your fault[.]  [F]inally made me why I don't even want to live any longer[.]  I'm sorry you'll have to clean up the mess[.]  I'm sure you'll just run away from it too[.]
>
> . . . .
>
> I'm sorry that I wasn't enough[.]
>
> . . . .
>
> Please tell my mom I love her[.]  [T]ell her that I'm really sorry[.]  [T]ell my kids I'm sorry I just can't take it anymore[.] . . .  I'm finally so broken I can't make it anymore and I don't think it's fair to put my daughter in this circumstance[.]  I hope that she finds a good home or somebody loves her[.]  I hope I said no is that I'm sorry that I want a headboard that anything that I could just do it[.]
>
> . . . .
>
> I'm just so done to hurting I never wanted you to do this to me take me to a place where I don't even want to exist[.]  [T]he saddest thing is that you told me you loved me[.]  [T]his is never what you would do to somebody you loved.  But I forgive you for all the lies all the mistrust [and] for hurting you the way that you did.  I'm just over it[.]  [I]t's not all your fault but in the end you won.  Hopefully you get everything you're looking at of life[.]  I wish that I could have been enough for you[.]  I wish you could have [come] home in bed with me.  I'm sorry you're going to have to clean up all this mess and you're going to have to explain it to my daughter.  [T]ry to come home before she's here too long alone.

Ex. 17, at 16787 (messages 9204, 9200, 9198, 9194).

---

[2] As part of its motion in limine, the State requested that Osborn be required to provide any proposed redactions to the text messages from Osborn's phone before trial.  The trial court granted the motion.  Osborn's resulting request to redact these messages was apparently made orally.

Osborn contended that these text messages contained references to purported suicidal ideation and argued that, unless redacted, the danger of unfair prejudice under ER 403 was too high. Osborn further contended that the messages raised concerns about her mental health and were not probative because they did not add anything of value to the State's case.

The State denied that the text messages revealed any suicidal ideation. Instead, the State's theory was that the text messages showed the extensive lengths that Osborn would go to manipulate and emotionally abuse Jason. The State contended that Osborn's intent behind those messages was to make Jason suffer, not to show she wanted to take her own life.

Osborn responded that even under the State's theory of the text messages' probative value, the messages were still more prejudicial than probative.

The trial court denied Osborn's request to make additional redactions to the text messages. The trial court reasoned that there was a context to the text messages that related to the circumstances of the case in a way that would be helpful to the jury. The trial court further elaborated on the probative value of the text messages stating,

> And there's an evolution in the nature of the communication that tends to suggest a dynamic in this relationship that I believe can be better understood and more fully explained by the jury having this information. I don't believe that the prejudicial effect substantially outweighs the probative value.
>
> I do believe there is probative value to it, even if it may appear to be cumulative. It's different enough to -- to be significant in developing an overall opinion in terms of the nature of this relationship. The jury will do with it what they will and they may or may not give any weight to it.

Verbatim Rep. of Proc. (VRP) at 300. The trial court concluded that the probative value of the information contained in the contested text messages was not substantially outweighed by the

unfair prejudice to Osborn, given the information's relevance to the State's organization of "its theme around the nature of [the] relationship" between Osborn and Jason. VRP at 300.

Ultimately, Osborn's text messages referring to suicidal ideation were not read to the jury. They were admitted as part of a trial exhibit (exhibit 17), which also included over a hundred other text messages, including some sent from Jason's phone.

III. JURY SELECTION

The case proceeded to a jury trial. During jury selection, the prosecutor asked jurors questions about reasonable doubt. One of the prosecutor's questions was,

Who here[] believes beyond a reasonable doubt that Neil Armstrong was the first person to walk on the moon? . . . All right, and who here does not feel comfortable saying beyond a reasonable doubt that Neil Armstrong was the first person to walk on the moon?

VRP at 230.

One juror, either Juror 1 or 2, expressed that they were not comfortable saying that Neil Armstrong was the first person to walk on the moon beyond a reasonable doubt. In response to the prosecutor's question, the juror said, "I have no idea" and the prosecutor responded, "No idea. So, if you have no idea, would you say that you're not comfortable saying beyond a reasonable doubt?" VRP at 230-231. The juror agreed.

The prosecutor then asked another juror who raised their hand, either Juror 1 or 2, what they thought about his question. The following exchange occurred:

Juror: It's just the beyond reasonable doubt. I believe he walked on the moon --
[Prosecutor]: Okay.
Juror: -- but that little phrase.
[Prosecutor]: So, what about that beyond a reasonable doubt?
Juror: I wasn't there.

6

[Prosecutor]: You weren't there?

Juror: No.

[Prosecutor]: Okay. And you weren't there (indiscernible)?

Juror: Right.

[Prosecutor]: You weren't there saying with Buzz Aldrin and Neil Armstrong, you know what, you guys go ahead.

Juror: Yeah.

[Prosecutor]: You get the glory. I'll stay back. Okay. And so, because you weren't there, you don't feel like --

Juror: No, I'm saying I'm sure he did. But it's just that phrase.

[Prosecutor]: Beyond a reasonable doubt?

Juror: Beyond a reasonable doubt. It's not 100%.

VRP at 231-232.

The prosecutor next asked Juror 4 what she thought about his Neil Armstrong question, and Juror 4 responded,

Juror 4: I kind of agree with -- with that. And I think -- I think people's perceptions in what's written is always subject to whoever's writing it and where it was coming from.

. . . .

Juror 4: And that -- and that no one knows everything that's going on.

VRP at 232. In response, the prosecutor asked a follow-up question to Juror 4, "Okay. So, maybe, maybe not?" VRP at 232. Juror 4 responded by repeating "Maybe, maybe not." VRP at 232.

The prosecutor then asked other jurors to explain why they believed beyond a reasonable doubt that Armstrong was the first person to walk on the moon. Other jurors answered there was information from a large number and variety of sources and they watched it on television.

7

The prosecutor next asked, "[W]ho agrees more with 1, 2, and 4, that hey, I wasn't there, right?"  VRP at 234-35.  Juror 4 then asked whether the prosecutor was talking about the first American to walk on the moon, and the following exchange took place:

> Juror[3]: There's a little semantics involved, isn't it?  I mean are we saying first American to walk on the moon?
>
> [Prosecutor] I was saying first person.
>
> Juror: Or was it --
>
> [Prosecutor]: First person to walk on the moon?
>
> Juror: Yeah.  So, I mean, there was so much done from an American perspective in terms of who --
>
> [Prosecutor]: Mm-hmm.
>
> Juror: -- was the first, and Neil Armstrong, I would probably agree with that.  But I -- I don't know of [a] being that is all encompassing at all.
>
> [Prosecutor]: Mm-hmm.
>
> Juror: That can tell me that that he was versus maybe some other.
>
> [Prosecutor]: Mm-hmm.  All right.
>
> Juror: So, that's -- that's the only place that I have a problem with.
>
> [Prosecutor]: And I appreciate you sharing that with me.  And this is one of the reasons that we do this whole process, right?  It's to -- I mean we want to see where people are coming from.  They come from different experiences, different walks of life, people have seen different things and this is part of the process, is asking about that to try to get the best jury we can for this specific case. . . .

VRP at 235-36.

---

[3] The juror is not identified by number in the transcript, but it is clear from a later GR 37 colloquy that this was Juror 4.

IV. THE STATE'S PEREMPTORY CHALLENGE AGAINST JUROR 4

Once the parties completed their examination of prospective jurors, both the State and Osborn exercised multiple peremptory challenges. The State exercised one of its peremptory challenges against Juror 2.[4] Osborn did not object.

The State then sought to use a peremptory challenge against Juror 4. Osborn raised a GR 37 objection to the challenge. The State defended its use of the peremptory challenge against Juror 4 stating,

> I think it's kind of remarkable that we're doing this, but okay. Juror No. 4 articulated several concerning responses to the State's questioning related to the moon landing. One of those was that she did not believe in the moon landing occurred beyond a reasonable doubt. The reasons that she gave for not believing that the moon landing [occurred] beyond a reasonable doubt to the statement [is] non-satisfactory.
>
> They included that there was potentially some higher mean or some other force that could have -- that could have been involved in -- in a different -- it was a -- it was a confusing response to what the State felt was a pretty straightforward question. I had significant concerns about Juror No. 4[']s ability to apply a reasonable, reasonable doubt standard in the jury room. So, that's -- that's why I moved for a peremptory challenge for Juror No. 4.

VRP at 273.

Osborn responded by maintaining her GR 37 objection, but she seemed to acknowledge that the State's reason for the peremptory challenge was not one explicitly prohibited by GR 37. Osborn stated,

> I believe the reason as articulated by the State is not, you know, it's [sic] certainly one of the new (indiscernible) reasons for which a peremptory cannot be used on the GR 37. I renew my objection, but I would defer to the [c]ourt.

VRP at 274.

---

[4] The State exercised peremptory challenges against Jurors 2, 4, 11, and 23.

No. 57282-6-II

The trial court said it anticipated that GR 37 could be an issue with Juror 4 and followed

the State's questioning of the juror "very carefully." VRP at 274. The trial court also referenced

Juror 4's last name and said that

> she appeared to be possibly [of] Samoan [descent], a woman of color[,] non-
> Caucasian woman by all appearances. She responded to a variety of questions put
> upon her throughout the course of voir dire and volunteered responses even. So,
> she was an active participant.

VRP at 274.

The trial court then explained that it believed the State had established an appropriate basis

to excuse Juror 4 beyond ethnicity, based on her responses to the State's beyond-a-reasonable-

doubt question. The trial court explained,

> It's not as though the State just glossed over her and then excused her on some
> superficial basis. The responses that she gave in connection with the State's
> exploration of this concept of beyond a reasonable doubt, was a little baffling. And
> a little bit hard to reconcile with the [i]nstructions that the [c]ourt gives on beyond
> a reasonable doubt. And so, I think the State has established an appropriate basis
> here for reasons beyond ethnicity.

VRP at 274.

The trial court then overruled the GR 37 objection, concluding,

> [A] reasonable person *would* not conclude that she was excluded on the basis of an
> impermissible factor under GR 37.

VRP at 274-75 (emphasis added). Juror 4 was excused.

V. TESTIMONY AT TRIAL

Following jury selection, the case proceeded to the presentation of witnesses and evidence.

Jason, Jerry, and the investigating detectives all testified at trial consistently with the above facts.

10

The State also called Officer Erik Smith to testify about the text messages that law enforcement extracted from Osborn's phone. The State asked Officer Smith to read several of the text messages that Osborn sent to Jason out loud. Osborn did not object.

In the first of these messages, Osborn accused Jason of kicking her out, throwing gasoline on her daughter's possessions, and bringing his father into their relationship:

> Yes. I really can't believe the kind of person you are. You kicked me out at the end of the month. You give me less than three hours' notice to get my stuff out and then you decide to throw gasoline on my daughter's food, her clothes, and all of our belongings, my dog's dog food. What kind of a person does that? Don't you have this grip of understanding you are the one that started this whole entire thing by not coming home making issues bigger than they needed to be. You brought your dad into our relationship which is so completely and utterly immature and then run to my mom, spill your guts about everything. Wow, this is really how you care for somebody trying to get me put in jail, so that my daughter gets taken away forever. What kind of a person really are you obviously?

VRP at 473-74.

In the next message, Osborn alleged Jason ruined her child's food and clothing and her belongings because he chose drugs over family. Osborn also called Jason a liar, stating,

> Okay. I hope you sleep good tonight. Put a big pat on your back for you and your dad for ruining an eight month old food and clothes and my stuff, because you decided to choose drugs over having a family. So, I don't care about your honesty anymore. You never gave it to me. All you are is a liar, and obviously the tree and the apple don't fall far from each other, as your dad and you are too alike. Probably maybe the family heritage, if you guys are stealing parts of the bible. I mean obviously, you're not good people from the get start. It shows your family is nothing but thieves and liars.

VRP at 474-75.

Officer Smith also read several other messages that Osborn sent to Jason that conveyed a troubled relationship:

11

And then you have the audacity to steal for -- for me again. You piece of crap. What the hell is wrong with you? Well, maybe you're right. You're [sic] work dad was right. He probably broke the r[*]tard. R[*]tard with a little dick, because I'll be asleep someday -- that we know mental status or an understanding would do something like that to a little kids stuff.

. . . .

Hope you're feeling like a really good guy right now. Pat on the back for being such a loser.

. . . .

You and your father spread your lies and say whatever you want. I don't care anymore. I don't care about you or anything about you. I hope you get exactly what you give out in this world.

. . . .

You took every single bit of bedding that I owed -- owned. Oh my pillow. So, I have no way to keep my daughter warm. You ruined her stuff. What kind of a human being are you really? Is this some kind of sick joke to you?

. . . .

So -- so, the top of it all, you took my propane, so I can't even make her bottles. Man, you are just one grand prize of a human being. I'm just floored by your actions by your behavior and what you've done. I hope that you can go tell whatever you want to anybody, but I have my side of the story too. And obviously, people can look right at you and see that you're not being honest.

. . . .

Thanks for ruining my life. I wish I would have never met you. Even the thought of you makes my skin crawl.

VRP at 475-76.

The State also introduced a Facebook message from Osborn to someone named Daryl Acord that she sent nearly a day and a half before the attempted robbery. The message said, "I'm really low on funds and I've been paying for the motel." VRP at 472.

Finally, the State called a witness who testified that Osborn knew, and had a connection with, Archer-Barrett, the man involved in the attempted robbery.

12

## VI. CLOSING ARGUMENTS

Following the evidence admitted at trial, the case proceeded to closing arguments. The State's theory was that Osborn was an accomplice to the plan to rob Jason. The State contended Osborn knew Archer-Barrett and he went to the trailer with her knowledge and assistance. The State's theory included the contention that Osborn's motive to rob Jason was based on the difficulties in their past relationship and her financial distress.

In contrast, Osborn challenged whether the State had proved its case beyond a reasonable doubt. Osborn argued there was reasonable doubt about whether Archer-Barrett used a gun when he attempted to rob Jason and Jerry. And Osborn pointed out that there were no text messages between her and Archer-Barrett.

Osborn also offered two other possible theories. Under the first theory, Osborn contended it could have been a coincidence that she saw someone on the side of the road coming from Jason's trailer. And under the second theory, Osborn could have merely driven Archer-Barrett over to Jason's trailer to ask for her things with the suggestion that she never knew about, or agreed to, any robbery.

## VII. VERDICT AND SENTENCING

The jury found Osborn guilty of attempted first degree robbery committed against an intimate partner. The trial court imposed a standard range sentence of 54 months.

Osborn appeals.

ANALYSIS

Osborn appeals based on two arguments. First, the trial court erred in overruling her GR 37 objection and, second, the trial court erred by admitting the unredacted text messages that purportedly showed suicidal ideation. Each will be addressed in turn.

I. GR 37 OBJECTION

Osborn argues that the trial court erred in overruling Osborn's GR 37 objection because an objective observer could view race or ethnicity as a factor in the State's exercise of a peremptory challenge to Juror 4. We disagree.

A. LEGAL PRINCIPLES

The purpose of GR 37 is to "eliminate the unfair exclusion of potential jurors based on race or ethnicity." GR 37(a). When a party exercises a peremptory challenge, the opposing party may object to raise the issue of improper bias. GR 37(c). Following an objection, "the party exercising the peremptory challenge shall articulate the reasons that the peremptory challenge has been exercised." GR 37(d).

The trial court then must evaluate the justifications "in light of the totality of circumstances." GR 37(e). The peremptory challenge must be denied "[i]f the court determines that an objective observer *could* view race or ethnicity as *a* factor in the use of the peremptory challenge." GR 37(e) (emphasis added). "[A]n objective observer is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in Washington State." GR 37(f). And "[t]he court need not find purposeful discrimination to deny the peremptory challenge." GR 37(e).

14

GR 37(h) provides that certain reasons for exercising a peremptory challenge are presumptively invalid. Those presumptively invalid reasons include: (i) having prior contact with law enforcement officers, (ii) expressing a distrust of law enforcement or a belief that law enforcement officers engage in racial profiling, (iii) having a close relationship with people who have been stopped, arrested, or convicted of a crime, (iv) living in a high-crime neighborhood, (v) having a child outside of marriage, (vi) receiving state benefits, and (vii) not being a native English speaker.

In determining whether to deny the peremptory challenge, the trial court's consideration should include, but not be limited to, the following five factors (identified as "circumstances") found in GR 37(g):

> (i) the number and types of questions posed to the prospective juror, which may include consideration of whether the party exercising the peremptory challenge failed to question the prospective juror about the alleged concern or the types of questions asked about it;

> (ii) whether the party exercising the peremptory challenge asked significantly more questions or different questions of the potential juror against whom the peremptory challenge was used in contrast to other jurors;

> (iii) whether other prospective jurors provided similar answers but were not the subject of a peremptory challenge by that party;

> (iv) whether a reason might be disproportionately associated with a race or ethnicity; and

> (v) whether the party has used peremptory challenges disproportionately against a given race or ethnicity, in the present case or in past cases.

The five factors are "not a checklist for trial courts to cross off but, instead, factors to be considered in making a determination." *State v. Tesfasilasye*, 200 Wn.2d 345, 358, 518 P.3d 193 (2022).

And under GR 37(i), a party must give advance notice to the court before relying on certain specified reasons for peremptory challenges that "have historically been associated with improper

discrimination in jury selection." Among these reasons are sleeping, inattentiveness, failing to make eye contact, exhibiting a problematic attitude, demeanor, or body language. GR 37(i).

GR 37 does not address the proper appellate standard of review. However, courts have generally applied a de novo standard of review in GR 37 cases. *E.g.*, *Tesfasilasye*, 200 Wn.2d at 355-56; *State v. Harrison*, 26 Wn. App. 2d 575, 582, 528 P.3d 849 (2023); *State v. Listoe*, 15 Wn. App. 2d 308, 321, 475 P.3d 534 (2020); *State v. Omar*, 12 Wn. App. 2d 747, 750-51, 460 P.3d 225, *review denied*, 196 Wn.2d 1016 (2020).

In *Tesfasilasye*, our Supreme Court stated that "most courts have effectively applied de novo review because the appellate court 'stand[s] in the same position as does the trial court' in determining whether an objective observer could conclude that race was a factor in the peremptory strike." 200 Wn.2d at 355-56 (quoting *State v. Jefferson*, 192 Wn.2d 225, 250, 429 P.3d 467 (2018)). The court agreed with a de novo standard of review under the facts of that case because "there were no actual findings of fact and none of the trial court's determinations apparently depended on an assessment of credibility." *Tesfasilasye*, 200 Wn.2d at 356. However, the court stated, "we leave further refinement of the standard of review open for a case that squarely presents the question based on a well-developed record." *Id.*

Like the Supreme Court, we decline to hold that de novo review necessarily applies in all circumstances in GR 37 cases. For example, a trial court's finding that a particular juror was a particular race or ethnicity is a factual finding, and arguably de novo review would not apply to such a finding. *See Listoe*, 15 Wn. App. 2d at 331-32 (Melnick, J., concurring).

In addition, these difficult determinations often rely on subtleties in human interactions that are absent from a cold written record. In some cases, the demeanor and body language of the

jurors (and possibly the attorneys), as well as other nuances such as voice inflections, may affect whether an objective observer could view race as a factor for a peremptory challenge. Appellate courts often have acknowledged that trial courts are in the best position to evaluate jurors because they can observe the jurors' demeanor. *See*, *e.g.*, *State v. Davis*, 175 Wn.2d 287, 312, 290 P.3d 43 (2012), *abrogated on other grounds by State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018), *cert. denied*, 571 U.S. 832 (2013); *State v. Lawler*, 194 Wn. App. 275, 282, 374 P.3d 278, *review denied*, 186 Wn.2d 1020 (2016). And as the Supreme Court noted in *Tesfasilasye*, there may be cases where the trial court's determinations are based on factual findings or credibility assessments. 200 Wn.2d at 355-56.

But here, as in *Tesfasilasye*, the trial court's GR 37 ruling did not involve disputed factual findings or credibility issues.[5] Therefore, we apply a de novo standard of review of the trial court's GR 37 decision, and we leave for another day whether a standard more deferential to the observations of the trial court is more appropriate.

B. APPLICATION

Osborn argues that the trial court applied the wrong standard in denying her GR 37 objection. Quoting the trial court's ruling, Osborn claims the trial court erred when it considered whether a *reasonable person would* conclude that Juror 4 was excluded on the basis of an impermissible factor under GR 37, as opposed to whether such an *objective observer could* view race or ethnicity as a factor in the use of the peremptory challenge.

---

[5] The trial court's finding that Juror 4 appeared to be *possibly* Samoan, and "a woman of color[,] non-Caucasian woman," was a factual finding, and arguably de novo review would not apply to that finding. VRP at 274; *See Listoe*, 15 Wn. App. 2d at 331-32 (Melnick, J., concurring). However, no party challenges the trial court's finding that Juror 4 was a person of color.

Osborn further contends that if the correct question was asked, an objective observer *could* have viewed race as a factor in the State's exercise of its peremptory challenge against Juror 4 for several reasons: (1) she was non-Caucasian in appearance, (2) her concerns were similar to other jurors, (3) she was not given the same opportunity to respond to clarifying questions, and (4) the prosecutor misrepresented her comments.

Osborn is correct that the trial court applied the wrong standard—the trial court's task is to determine whether "an *objective observer could* view race or ethnicity as a factor in the use of the peremptory challenge," not whether a *reasonable person would* make such a conclusion under GR 37(e). (Emphasis added.)

But even if the trial court applied the incorrect standard, our inquiry continues. We must apply the correct standard and determine whether an objective observer could view race or ethnicity as a factor in the State's use of the peremptory challenge.[6] *See* GR 37.

Here, the State's stated reason for using a peremptory challenge on Juror 4 was because of its concern about the juror's ability to apply a reasonable doubt standard. Typically, this is a legitimate, race-neutral reason for the State to exercise a peremptory challenge.

Juror 4's answers in jury selection provided objective reasons for the State's concern. At first, Juror 4 indicated that she was uncertain about whether she believed beyond a reasonable doubt that Neil Armstrong was the first person to walk on the moon because "people's perceptions

---

[6] Relying on *Tesfasilasye*, Osborn suggests that the trial court's use of the incorrect standard is dispositive of her appeal. She is mistaken. In *Tesfasilasye*, our Supreme Court reversed the trial court not simply because it applied the wrong standard in evaluating the GR 37 objection, but also because, under the correct standard, an objective observer could view race as a factor for striking both jurors at issue. 200 Wn.2d at 359-62.

in what's written is always subject to whoever's writing it and where it was coming from."  VRP at 232.  When the prosecutor summarized her response about whether beyond a reasonable doubt Neil Armstrong was first to walk on the moon by saying, "So, maybe, maybe not?"  VRP at 232. Juror 4 responded with apparent agreement by repeating, "Maybe, maybe not."  VRP at 232.

The jury pool continued to collectively answer the State's questions about reasonable doubt and Neil Armstrong.  Some moments later, Juror 4 asked whether the prosecutor was talking about the first *American* to walk on the moon, and the prosecutor reiterated that the questions were about the "first person to walk on the moon."  VRP at 235.  Juror 4 then suggested that she probably agreed that Neil Armstrong was the *first person* to do so, but said she did not know "of [a] being that is all encompassing at all. . . . That can tell me that that he was versus maybe some other." VRP at 235.

Precisely what Juror 4 meant by these answers is somewhat unclear—even the trial court who witnessed the statements in the courtroom characterized them as "a little baffling"—but in the face of an extensive dialogue with multiple jurors discussing the moon landing in the context of the reasonable doubt burden of proof, the State's concern about Juror 4's ability to apply this standard was valid.[7]

---

[7] Osborn contends that when the State explained its peremptory challenge of Juror 4 to the trial court, it mischaracterized her responses.  Osborn complains the State reframed Juror 4's responses as pertaining to the *moon landing*, rather than whether Neil Armstrong was to first to walk on the moon and, thus, misrepresented nuances in her responses.  According to Osborn, Juror 4 was merely "express[ing] a reason to question assertions, not an unwillingness to evaluate evidence." Br. of Appellant at 16.  While it is true that the State summarized Juror 4's answers when discussing its challenge, when viewed in context—i.e., a discussion with the trial court who had just witnessed the questioning—the summary cannot be said to unfairly misrepresent the questioning.

This conclusion easily dispenses with any concern that the presumptively invalid reasons for challenges listed in GR 37(h) were involved here. As noted above, these invalid reasons include things like, having prior contact with law enforcement officers or expressing a distrust of law enforcement, having a close relationship with people who have been arrested or living in a high-crime neighborhood. GR 37(h). Nothing about the State's stated concern about Juror 4's statements about Neil Armstrong implicates any of these GR 37(h) invalid reasons.[8]

But even if there is a facially valid reason for the use of a peremptory challenge, the five factors listed in GR 37(g) must be considered. Here, however, each of these factors, discussed below, does not help Osborn.

Factors (i) and (ii) require the court to consider the number and types of questions posed to Juror 4 and whether more or different questions were asked to other jurors. GR 37(g)(i)-(ii). When the State asked the venire about who believed beyond a reasonable doubt that Neil Armstrong was the first person to walk on the moon, Jurors 1, 2, and 4 all gave answers that suggested that they did not believe beyond a reasonable doubt that Neil Armstrong was the first person to walk on the moon. The State asked each one follow-up questions. Although the State did not ask Juror 4 as many follow-up questions as some of the other jurors, it did attempt to clarify her concerns about its Neil Armstrong question. Factors (i) and (ii) do not support the conclusion

---

[8] The State's basis for exercising its peremptory challenge also does not appear to implicate any of the reasons for peremptory challenges that "have historically been associated with improper discrimination in jury selection" that would have required the State to provide advance notice to the trial court under GR 37(i). Moreover, the trial court expressly stated that it "followed the questioning of Juror No. 4 very carefully." VRP at 274.

20

that an objective observer could view Juror 4's race or ethnicity as a factor in the use of the peremptory challenge.

Factor (iii) requires the court to consider whether other jurors provided similar answers as Juror 4 but were not subjected to peremptory challenges. GR 37(g)(iii). Here, two other jurors provided similar answers to Juror 4 about the Neil Armstrong question, Jurors 1 and 2, and the State exercised a peremptory challenge against one of the others, Juror 2. And nothing in the record suggests that the challenge to Juror 2 implicated GR 37. Factor (iii) does not support the conclusion that an objective observer could view Juror 4's race or ethnicity as a factor in the use of the peremptory challenge.

Factor (iv) requires the court to consider whether a stated reason for the peremptory challenge might be disproportionately associated with a race or ethnicity. GR 37(g)(iv). The State's basis for exercising a peremptory challenge on Juror 4 was its concern of her ability to apply a reasonable doubt standard. Without question, the probing of potential jurors' thoughts about the burden of proof in criminal trials is a common occurrence and not typically associated with race or ethnicity. Factor (iv) does not support the conclusion that an objective observer could view Juror 4's race or ethnicity as a factor in the use of the peremptory challenge.

Factor (v) requires the court to consider whether the party making the challenge has disproportionately used peremptory challenges against a given race or ethnicity in the present case or past cases. GR 37(g)(v). The record does not indicate whether any other jurors were persons of a particular race or ethnicity or whether the State exercised peremptory challenges against any other persons of a particular race or ethnicity. The record also does not indicate whether the State has disproportionately used peremptory challenges against a given race or ethnicity in past cases.

On this record, it is unknown whether factor (v) supports the conclusion that an objective observer could view Juror 4's race or ethnicity as a factor in the use of the peremptory challenge.

In sum, none of these five factors of GR 37(g) support Osborn's position. The State's reason for the challenge was based on her responses to a relatively straightforward question—whether the jurors believed beyond a reasonable doubt that Neil Armstrong was the first person to walk on the moon—designed to explore the jurors' perspectives on the applicable burden of proof. And another juror who provided a similar response to Juror 4, Juror 2, was removed from the jury.

Under the totality of the circumstances, we conclude that an objective observer could not view race or ethnicity as a factor in the use of the State's peremptory challenge against Juror 4. Therefore, we hold that the trial court did not err in overruling Osborn's GR 37 objection.

II. ADMISSIBILITY OF TEXT MESSAGES UNDER ER 403

Relying on ER 403, Osborn next argues that the trial court erred in admitting unredacted text messages that expressed purported suicidal ideation because they were highly prejudicial and only marginally probative. We disagree.

A. LEGAL PRINCIPLES

"Relevant evidence" is defined under ER 401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." "All relevant evidence is admissible, except as limited by constitutional requirements or as otherwise provided by statute, by these rules, or by other rules or regulations applicable in the courts of this state." ER 402.

But ER 403 provides that even if relevant, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." ER 403. Evidence is unfairly prejudicial when it is more likely to create an emotional response from a jury instead of a rational decision. *State v. Scherf,* 192 Wn.2d 350, 388, 429 P.3d 776 (2018).

The trial court has wide discretion when balancing the probative value of evidence against the potential prejudicial effect under ER 403. *State v. Rivers*, 129 Wn.2d 697, 710, 921 P.2d 495 (1996). We review a trial court's decision to admit evidence for an abuse of discretion. *Scherf,* 192 Wn.2d at 386-89 (holding that trial court did not abuse its discretion in refusing to redact defendant's recorded statements where the dangers of unfair prejudice, confusion of the issues, or misleading the jury did not substantially outweigh the evidence's probative value). A trial court abuses its discretion when its decision is manifestly unreasonable or when it reaches its decision based on untenable grounds or untenable reasons. *Scherf*, 192 Wn.2d at 387.

If the admission of the evidence is determined to be error, it is only reversible if there is a reasonable probability that, but for the error, the outcome of the trial would have been materially different. *State v. Gresham*, 173 Wn.2d 405, 425, 269 P.3d 207 (2012); *State v. Mee,* 168 Wn. App. 144, 160, 275 P.3d 1192, *review denied,* 175 Wn.2d 1011 (2012) (holding that trial court's error in admitting gang-related evidence was harmless because it did not materially affect the outcome of defendant's trial given overwhelming evidence establishing his guilt).

B. APPLICATION

Osborn contends the trial court erred under ER 403 by admitting unredacted text messages that purportedly showed suicidal ideation. According to Osborn, any suicidal thoughts were irrelevant because they did not make any of the elements of the offense of robbery more or less

probable. Osborn further argues that these messages carried a significant danger of unfair prejudice because the jury could have speculated about Osborn's mental health and relied on the stigma that mentally ill people commit crimes, rather than relying on the proper admissible evidence. Finally, Osborn argues that the text messages were also cumulative because there was already a significant amount of evidence as to the nature of Osborn's relationship with Jason.

Osborn contends the trial court's error requires reversal because there is a reasonable probability that the court's admission of these text messages affected the jury verdict. According to Osborn, the State's case was weak, so evidence of Osborn's possible mental health concerns following the breakup likely influenced the jury to disregard the shortcomings in the State's case and assume Osborn was guilty.

We disagree. The trial court's balancing of ER 403's considerations was not an abuse of discretion.

Here, the text messages, including the purported suicidal ideation, were relevant to the State's theory for motive. The State's theory was that Osborn's motive for the robbery was rooted in both her troubled relationship with Jason as well as her financial distress. Prior to trial, the State argued that the text messages did not show that Osborn was really suicidal, but was merely engaging in ongoing manipulation of Jason. The purported suicidal ideation was unique to the challenged messages—the numerous other texts did not include this component—which made these messages directly relevant to this theory of the manipulative nature of Osborn in her

relationship with Jason. Thus, the trial court's decision that the text messages were relevant was not untenable.[9]

Similarly unpersuasive is Osborn's argument that the text messages would create a high danger of unfair prejudice. Osborn speculates that the messages would lead to a negative perception of her and her mental health and cause the jury to associate mental health with criminality. But the reverse is also possible; the text messages could have caused the jury to feel sympathy for Osborn because of her circumstances, and that sympathy could have colored the jury's evaluation of the evidence.

But even if there was *some* prejudice arising from the text messages, the trial court did not abuse its discretion when it concluded that the unfair prejudice did not *substantially outweigh* the probative value of the information contained in the contested messages given their relevance to the State's theory of motive.

Osborn's argument about the cumulative nature of the text messages is perhaps her strongest, but ultimately it, too, fails. Even though many other text messages were admitted that exhibited the troubled dynamics of Osborn and Jason's relationship, the particular text messages challenged by Osborn uniquely showed, if the State's theory was true, the extreme lengths to which Osborn would go to manipulate Jason. As such, they were different enough from the many other texts to not be considered cumulative.

---

[9] We note that our role in this appeal is not to assess the factual accuracy of the State's theories or to determine whether Osborn was truly in a mental health crisis at the time of these text messages. Nothing in our review of whether the trial court abused its discretion should be seen as insensitivity to the very serious issue of mental health.

No. 57282-6-II

Considering the trial court's wide discretion to balance the probative value of evidence against the prejudicial effect under ER 403, we hold that the trial court did not abuse its discretion when it ruled that the danger of unfair prejudice did not substantially outweigh the probative value of the text messages containing references to purported suicidal ideation.[10]

CONCLUSION

Because the trial court did not err by overruling Osborn's GR 37 objection or by admitting the unredacted text messages pertaining to purported suicidal ideation, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

GLASGOW, J.

CRUSER, A.C.J.

---

[10] Because the trial court committed no error in the admission of the limited number of text messages challenged by Osborn, we need not address whether the admission prejudiced Osborn. Despite not addressing prejudice, we note the specific messages challenged by Osborn purporting to show suicidal ideation were not read to the jury or referenced in witness testimony, unlike other texts. The challenged texts were only admitted as a part of an exhibit that included over a hundred other texts, including texts from Jason, that Osborn does not challenge. This method of admission likely would have diffused any prejudicial effect on the jury.

26